Victor Sherman (SBN 38483)
Law Offices of Victor Sherman
11400 West Olympic Blvd. #1500
Los Angeles, CA 90405
(424) 371-5930
Victor@VictorSherman.law
(Attorney for Mr. Kumar)

Patrick M. Griffin (SBN 276171)
Griffin Law Office, APC
1350 Columbia St., Suite 401
San Diego, CA 92101
(619) 269-2131
Patrick@GriffinLawOffice.com
(Attorney for Mr. Dmitrienko)

Devin Burstein (SBN 255389)
Warren & Burstein
501 West Broadway, Suite 240
San Diego, California 92101
(619) 234-4433
db@wabulaw.com

John C. Ellis, Jr. (SBN 228083)
Law Offices of John C. Ellis, Jr.
2495 Truxton Road, Suite 206
San Diego, California 92106
(619) 501-5522
john@johnellislaw.com
(Attorney for Mr. Hosseini)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SEYYED HOSSEIN HOSSEINI,<br>ALEXANDER DMITRIENKO,<br>EDWIN HARMENDRA KUMAR,<br><br>Defendants. | Case No.: 21-cr-01623-JLS<br><br>Defendants' joint motion to compel discovery and for leave to file further motions.<br><br>Date: August 23, 2023<br>Time: 9:00 a.m. |

### A.    Introduction.

This is not a boilerplate discovery motion.  It focuses solely on the

documents and information in the government's possession related to its use

of an unknown third-party country to obtain the evidence in this case. As discussed below, this material is key to defense preparations. The prosecution, however, has declined to provide this information.

By way of background, the government admits it created the Anom service at the heart of this case with a single goal: convincing criminals to use its encrypted phones, which the FBI could secretly monitor through a backdoor written into the software. But because of the stringent constitutional and statutory requirements that such a program would trigger domestically within the United States, the government needed an international workaround. Using a Mutual Legal Assistance Treaty (MLAT), the government asked an unidentified, third-party country in Europe to intercept the messages and then provide the data directly to the FBI.

That third-party country agreed, and the FBI helped arrange for a computer server to be placed in that country to intercept the message data. Thereafter, without ever reviewing the contents of the messages, the third-party country provided the data to United States law enforcement multiple times per week. In other words, it was the FBI in the United States that first reviewed the contents of the messages.

By the government's own admission, most of the allegedly inculpatory evidence in this case came from and is contained within those intercepted

messages.  The defense, therefore, requested that the government disclose: (a) the identity of the third-party country, (b) the location of the server within that country, and (c) the specific communications with that country about hosting the server and providing the information.  The government, however, has refused, declining to provide even the identity of the third-party country.

Under basic principles of fairness and due process, as well as Federal Rule of Criminal Procedure 16, this is untenable.  Without the requested information, the movants cannot begin investigating the legality of the intercepts nor the reliability and authenticity of the alleged evidence at the core of this case.  Nor can they propose letters rogatory to obtain critical evidence from the third-party country, seek overseas depositions, hire foreign investigators to interview witnesses, or file their anticipated motion to suppress.  Accordingly, the movants respectfully request the Court grant this motion.

## B.   Relevant facts.

To avoid unnecessary factual disputes, the following summary comes largely verbatim from the government's filings in this case.[1]

---

[1] The movants do not concede that the facts alleged by the government or others are true.

"In 2017, FBI San Diego began investigating a company named Phantom Secure which provided hardened encrypted devices [essentially a phone that (1) sends and receives encrypted electronic communications, and/or (2) encrypts the data stored on the device.]. The investigation revealed Phantom Secure sold its encrypted devices exclusively to members of criminal organizations. The company targeted its customer base to transnational criminal organizations ('TCOs') (primarily drug traffickers) and provided an array of services intended to impede law enforcement's ability to legally surveil their communications and collect evidence of criminal activities. The investigation uncovered the use of Phantom Secure devices all around the world by criminal syndicates." Appendix (APP):5.[2]

In 2018, during the Phantom Secure investigation, "San Diego FBI agents recruited a Confidential Human Source ('CHS') who had been developing the 'next generation' encrypted communications product, poised to compete for market share against established hardened encrypted device competitors. At the time, the void created by Phantom Secure's dismantlement provided a new opportunity for criminal users to switch to a new, secure brand of device[.]" APP:7.

---

[2] Unless otherwise noted, within quotations, all emphasis is added and all internal citations as well as internal quotation marks are omitted.

"The CHS offered this next generation device, named 'Anom,' to the FBI to use in ongoing and new investigations. The CHS also agreed to offer to distribute Anom devices to some of the CHS's existing network of distributors of encrypted communications devices, all of whom have direct links to TCOs." APP:7.  The FBI agreed to the proposal, and "[b]y introducing Anom to the CHS's trusted distributors, who were likewise trusted by criminal organizations, the FBI aimed to grow the use of Anom organically through these networks."  APP:8.

Thereafter, "[t]he FBI opened a new covert investigation, Operation Trojan Shield, which centered on exploiting Anom by inserting it into criminal networks and working with international partners, including the Australian Federal Police ("AFP"), to monitor the communications. Before the device could be put to use, however, the FBI, AFP, and the CHS built a master key into the existing encryption system which surreptitiously attaches to each message and enables law enforcement to decrypt and store the message as it is transmitted."  APP:8.

However, the users of Anom were "unaware of this capability. By design, as part of the Trojan Shield investigation, for devices located outside of the United States, an encrypted 'BCC' of the message is routed to an 'iBot' server located outside of the United States, where it is decrypted from the CHS's

encryption code and then immediately re-encrypted with FBI encryption code. The newly encrypted message then passes to a second FBI-owned iBot server, where it is decrypted and its content available for viewing in the first instance."  APP:8.

From inception, "[t]he CHS [] controlled the distribution of Anom devices in consultation with the FBI."   APP:8.   The FBI first worked with the Australian government to "beta test" the program.  APP:9.  "But the FBI itself was not yet reviewing any of the decrypted content of Anom's criminal users." APP:9.  This began to change in the summer of 2019, when the FBI and federal prosecutors "**engaged representatives from a third country to receive an iBot server of its own and obtain the contents of communications occurring between Anom users**."  APP:9.[3]

The "[n]egotiations about the logistics and legal framework in the third country progressed throughout fall 2019. The third country agreed to obtain a court order in accordance with its own legal framework to copy an iBot server located there and provide a copy to the FBI pursuant to a Mutual Legal Assistance Treaty."  APP:9-10.

But "[u]nlike the Australian beta test, the third country would not

---

[3] This unknown country is part of the European Union.  APP:44.

6

review the content in the first instance," that would be done only by the FBI. APP:10. Moreover, given domestic constitutional and statutory constraints on electronic interceptions, the "FBI geo-fenced the U.S., meaning that any outgoing messages from a device with[in] [the] U.S. [ ] would not have any communications on the FBI iBot server" and would not be reviewed by U.S. law enforcement. APP:10.

"In October 2019, the third country obtained a court order which enabled the copying of the iBot server and the receipt of its contents every two to three days. The initial MLAT between the U.S. and the third country authorized FBI to receive data from October 7, 2019, through January 7, 2020. Due to technological issues with decryption and putting the content into a usable format, the FBI did not begin receiving the actual server content from the third country until October 21, 2019." APP:10.

Thereafter, "the third country [] obtained additional court order pursuant to its own laws to copy the iBot server and the United States has obtained the server data pursuant to additional MLATs. The third country provide[d] Anom server data to the FBI every Monday, Wednesday, and Friday, and [] continue[d] to do so until the expiration of the third country's court order on June 7, 2021. This data comprises the encrypted messages of all of the users of Anom with a few exceptions (e.g., the messages of

approximately 15 Anom users in the U.S. sent to any other Anom device are not reviewed by FBI)."  APP:10.

"Since October 2019, the FBI has reviewed the content from the iBot server in the third country pursuant to the MLAT. They [the FBI] have translated the messages (where necessary and where translations are available) and have catalogued more than 20 million messages from a total of 11,800 devices . . . located in over 90 countries."  APP:10-11.

Based largely on the content obtained from the iBot server in the third country, the government filed the current indictment against the movants and their co-defendants, charging one count of Racketeering Conspiracy to Conduct Enterprise Affairs (RICO Conspiracy).  *See* 18 U.S.C. §§ 1962(c)-(d); ECF. No. 68; APP:35.

Following the movants' arrests, defense counsel and the government had several informal discussions regarding discovery but were unable to reach an agreement.  As a result, on June 23, 2023, defense counsel sent a written discovery request to the government for the following information related to the third-party country:

1. The identity of the third country hosting the "iBot" server.

2. The location within the country of the "iBot" server.

3. The agency or agencies within the country with whom the U.S. government

coordinated its efforts.

4. All communications between the U.S. government and the third country regarding the Anom program, including the placement of the "iBot" server, and the capture, retention, and dissemination of the content on the server.

5. The final agreement and any draft agreements [pursuant to the MLAT] between the U.S. government and the third country related to the Anom program and the "iBot" server.

APP:45.

On July 5, 2023, the parties met in person pursuant to Federal Rule of Criminal Procedure 16.1 to discuss discovery issues. At that meeting, the government declined to provide any of the requested information related to the third-party country, including its identity.

## C. Argument in support of motion to compel discovery.

The government misunderstands its discovery obligations. Pursuant to Federal Rule of Criminal Procedure 16, "defendants [have] a broad right to discovery." *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010). Upon the defendant's request, the government "*must*" disclose all "documents, data, [and] objects, . . . within the government's possession, custody, or control . . . [that are] material to *preparing* the defense[.]" Fed. R. Crim. P. 16(a)(1)(E)(i).

As the Ninth Circuit has repeatedly made clear, the government's discovery obligations extend to any information that might be "helpful" to preparing "a *possible* defense." *United States v. Budziak*, 697 F.3d 1105, 1111

(9th Cir. 2012).  This is an intentionally low threshold.  *See id.*

Thus, "[i]nformation that is not exculpatory or impeaching may still be relevant to developing a possible defense." *United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013).  "Even *inculpatory* evidence may be relevant. A defendant who knows that the government has evidence that renders his planned defense useless can alter his trial strategy.  Or he can seek a plea agreement instead of going to trial." *Id.*; *see also United States v. Doe*, 705 F.3d 1134, 1151 (9th Cir. 2013) ("Even if the documents caused [the defendant] to completely abandon the [] defense and take an entirely different path, the documents would still have been 'material to preparing the defense' under Rule 16[.]").

Moreover, the "defendant needn't spell out his theory of the case in order to obtain discovery.  Nor is the government entitled to know in advance specifically what the defense is going to be." *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013).  Further, and particularly important here, "material to preparing the defense," is *not* limited to responding to the government's case-in-chief.  *See United States v. Soto-Zuniga*, 837 F.3d 992, 1000-01 (9th Cir. 2016).  Rather, under Rule 16, defense preparation includes information helpful to preparing a pretrial motion to suppress evidence.  *See*

*id.* ("Rule 16(a)(1)(E) permits discovery related to the constitutionality of a search or seizure.").

Here, the requested information easily satisfies Rule 16's low threshold. It is relevant to the defense preparation in terms of investigation, substantive pre-trial motions, motions in limine raising evidentiary challenges, and trial preparation. Indeed, as this Court is undoubtedly aware from presiding over the Seventh Fleet trial, the government's reliance on material obtained from foreign computer servers raises all types of evidentiary issues in terms of authenticity, reliability, retention policies, and chain of custody.

1.   The requested information is material to defense investigation and motions in limine.

Moreover, at a minimum, the defense is constitutionally obligated to conduct a full investigation into all the circumstances under which the messages at the core of this case were obtained, retained, and passed to the FBI. *See Duncan v. Ornoski*, 528 F. 3d 1222, 1234 (9th Cir. 2008) ("[C]ounsel has a duty to make reasonable investigations"). That is the only way the defense can assess the authenticity and reliability of the messages for purposes of evidentiary challenges in limine and at trial.

To begin this investigation, however, the defense needs to know the identity of the third-party country, the location of the iBot server in that

country, and the nature of the agreement.  With that information, the defense then intends to ask the Court for letters rogatory to the subject country seeking documents about its practices in obtaining, retaining, and disseminating the content from the server, which in turn will be critical to the admissibility of the subject evidence.

This is the exact procedure that numerous cases have endorsed in analogous circumstances.  For instance, in *United States v. Lee*, 723 F.3d 134, 142 (2d Cir. 2013), the defendant challenged his conviction based in part on his inability to obtain information about a foreign (Jamaican) wiretap application.  The Second Circuit explained that he should have "requested the foreign materials he sought through letters rogatory."  *Id*. at 142 n.6.

Specifically, he "could have asked the District Court to issue letters rogatory to obtain documentary evidence in a foreign country pursuant to 28 U.S.C. § 1781. Section 1781(b) permits . . . . (2) the transmittal of a letter rogatory or request *directly from a tribunal in the United States to the foreign or international tribunal, officer, or agency to whom it is addressed* and its return in the same manner."  *Id.* (quoting *United States v. Yousef*, 327 F.3d 56, 112 n.46 (2d Cir. 2003)).

Even more on point is *United States v. Karake*, 281 F. Supp. 2d 302, 304 (D.D.C. 2003), a case with significant evidence located in Rwanda.  There,

12

addressing similar concerns, the district court "ordered the government *to identify the foreign entities that have provided, or reasonably may be expected to provide or possess, information that is material to the case so that defendants could issue more meaningful letters rogatory*." *Id.* at 305.

Here, the movants are seeking the same type of information for the same reason. Plainly, they cannot draft meaningful letters rogatory or present them to this Court without the government first "identify[ing] the foreign entities that have provided, or reasonably may be expected to provide or possess, information that is material to the case." *Id.* For this reason alone, the information they seek in this motion is material to defense preparation and discoverable under Rule 16. And there is more.

Beyond letters rogatory, the defense also intends to retain investigators in the third-party country to search for documents and potential witnesses who can provide firsthand information about the Anom program's administration in that country. These witnesses could then be the subject of requests for foreign depositions. *See* Fed. R. Crim. P. 15. And under Rule 16, "[t]he test is not whether the discovery is admissible at trial, but whether the discovery may assist [the defendant] in formulating a defense, including leading to admissible evidence." *Soto-Zuniga*, 837 F.3d at 1003.

Indeed, the defense would be beyond remiss to rely on the government's

"official" story, without conducting an independent investigation.  After all, "the ten most terrifying words in the English language may be, 'I'm from the government and I'm here to help you.'" *Garcia-Aguilar v. United States Dist. Court*, 535 F.3d 1021, 1023 (9th Cir. 2008).

2.      The requested information is material to preparing a potentially dispositive motion to suppress.

Additionally, the movants need the requested information so they can hire legal counsel in the third-party country to help assess the legality of the Anom surveillance program under the laws of that country.  That assessment, in turn, is important to an anticipated, and potentially dispositive, motion to suppress the evidence obtained from the foreign server.  *See Soto-Zuniga*, 837 F.3d at 1000-01 ("Rule 16[] permits discovery related to the constitutionality of a search or seizure.").

To this end, although "suppression is generally not required when the evidence at issue is obtained by foreign law enforcement officials," there are "two circumstances where evidence obtained in a foreign jurisdiction may be excluded[:] [f]irst, where the conduct of foreign officials in acquiring the evidence is so extreme that it shocks the judicial conscience and *second, where cooperation with foreign law enforcement officials may implicate constitutional restrictions*."  *United States v. Getto*, 729 F.3d 221, 227-28 (2d. Cir. 2013).

14

As relevant here, "[w]ithin the second category for excluding evidence, constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials' rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials." *United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992) (cited favorably in *United States v. Navarro-Montes*, No. 09-cr-577-MMA, 2011 U.S. Dist. LEXIS 8315, at *14 (S.D.C.A. 2011)).

As to the first situation, agency, the Ninth Circuit has held that the inquiry requires the court "address whether agents of the United States had sufficient participation in the wiretaps to invoke exclusionary rule analysis." *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987). And if "United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials, *the law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable.*" *Id.*

Here, based on the government's own admissions, it caused the third-party country to take part in a U.S. investigation. APP:9-10. The third-party country did not even review the contents of the intercepted messages, only the

FBI did.   APP:10.   Thus, this was at least a joint venture.   The defense, however, cannot undertake the next step of consulting "the law of the foreign country . . . as part of the determination whether or not the search was reasonable" because we do not know the country.   *Peterson,* 812 F.2d at 490. This is yet another reason why the requested information is material to preparing the defense.

What's more, as to the second situation noted above, the defense has a good faith belief that "the cooperation between the United States and foreign law enforcement agencies [was] designed to evade constitutional requirements applicable to American officials," which provides another potential basis for suppression.   *Getto*, 729 F.3d at 232.   This belief is based on the government's admission that the "FBI geo-fenced the U.S., meaning that any outgoing messages from a device with[in] [the] U.S. [] would not have any communications on the FBI iBot server" and would not be reviewed by U.S. law enforcement.   APP:10.

The most likely reason the FBI would intentionally *exclude* all U.S.-based communication is to avoid the Fourth Amendment's warrant

requirement and Title III's rigors.  APP:44.[4]  There is no plausible alternative.

Plainly, the requests and the communications about the Anom program between the U.S. government and the foreign government are important to this analysis.  They will almost certainly shed additional light on why the U.S. government chose this particular country to host the server, and the nature of the joint venture.[5]  All of this is material to the motion to suppress.  To be clear, the movants are not attempting to pre-litigate a suppression motion. That is entirely premature.  As such, they have not included all their potential arguments in support of suppression.  Instead, the movants seek only to demonstrate the relevance of the information requested.

***

In the final analysis, the government should not be permitted to use a

---

[4] In fact, in a letter to Finnish authorities addressing the supposed legality of the Anom program, the assigned prosecutor in this district noted that, because the messages did not "traverse[] United States infrastructure, [] they did not implicate the Wiretap Act, 18 U.S.C. §§ 2510 et seq."  APP:44.

[5] The government indicated some *potential* willingness to provide redacted English translations of certain documents.  This is insufficient.  The defense cannot evaluate the validity of any such translation unless we know the language it is translated from.  Moreover, the movants should not have to rely on the government's view of what might be helpful.  Instead, the defense is entitled to the entirety of the governmental communications with the third-party country regarding Anom for purposes of its suppression motion.

third country as a sword in its investigation, while also using its identity as a shield to prevent the movants from preparing a robust defense. Neither the Constitution nor Rule 16 permits such prosecutorial shenanigans. As the Supreme Court has held, "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Here, fair treatment requires basic information about the third-party country at the heart of this case. The movants, therefore, respectfully request the Court order the government to provide in discovery:

1. The identity of the third country hosting the "iBot" server.

2. The location within the country of the "iBot" server.

3. The agency or agencies within the country with whom the U.S. government coordinated its efforts.

4. All communications between the U.S. government and the third country regarding the Anom program, including the placement of the "iBot" server, and the capture, retention, and dissemination of the content on the server.

5. The final agreement and any draft agreements pursuant to the MLAT requests between the U.S. government and the third country related to the Anom program and the "iBot" server.

For all the reasons discussed above, these requests are narrowly tailored to obtain information and documents material to preparing the defense,

generating letters rogatory, conducting an independent defense investigation, preparing a motion to suppress, and other potential motions.

**D.   Argument in support of motion for leave to file additional motions.**

Finally, once the movants have the information necessary to conduct their investigation, they seek permission to file substantive motions, and potentially further discovery motions.   Although the movants have no obligation to disclose the topics of their anticipated substantive motions to the government at this time, in the interest of fair play, they provide the following summary:

(1) The suppression motion discussed above.

(2) A challenge to venue under 18 U.S.C. § 3238 because it appears from discovery thus far that the alleged "offenses beg[a]n . . . out of the jurisdiction of any particular State or district."  In such a case, venue exists "in the district in which the offender . . . is arrested or is *first brought*[.]"  *Id.* "The district a defendant is first brought to is the district into which the defendant first comes [from outside the United States' jurisdiction] while in custody." *United States v. Ghanem*, 993 F.3d 1113, 1121-22 (9th Cir. 2021).   To establish proper venue in this Court, therefore, "the government must show that [the defendants] w[ere] 'first brought to' or 'arrested' in the [SDCA]." *United States v. Liang*,

224 F.3d 1057, 1060 (9th Cir. 2000).  At this juncture, it does not appear that happened, but the defense is still researching this issue.

(3) A motion to dismiss for failure to state an offense.  There exists an issue of first impression as to whether, for purposes of the RICO statute, the government can create the "enterprise."  Here, the enterprise is alleged to be Anom and the government tacitly admits it was the creator and but-for cause of that enterprise.  In a somewhat analogous situation, the law is clear that a defendant cannot be convicted of conspiring with a government agent or informer.  *See United States v. Escobar de Bright*, 742 F.2d 1196, 1199 (9th Cir. 1984) (en banc).  And the movants intend to argue that the same rationale applies in the context of a RICO enterprise.

At this point, these are examples of the substantive motions the movants are contemplating.  Of course, this is subject to change depending on what is revealed with further discovery and investigation.

**E.    Conclusion.**

The movants respectfully request the Court grant their motion to compel discovery and for leave to file further briefing.

Dated: July 20, 2023                    Respectfully submitted,
                                        *Devin Burstein*
                                        *Victor Sherman*
                                        *Patrick Griffin*
                                        *John Ellis*

20

# APPENDIX

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

unsealed on 6/7/21 per order -dlg

~~SEALED~~

for the
Southern District of California

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) |
| Google LLC 1600 Amphitheater Parkway, Mountain View, CA 94043 Host of expliamdavis@gmail.com | ) ) ) ) |

Case No. '21 MJ01948

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841, 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

See Attached Affidavit of FBI Special Agent Nicholas Cheviron, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Nicholas Cheviron, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date: ___May 17, 2021___

*Judge's signature*

City and state: ___San Diego, California___

Honorable Michael S. Berg, U.S. Magistrate Judge
*Printed name and title*

1

# AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANT

I, Nicholas I. Cheviron, being duly sworn, depose and state as follows:

1.    This affidavit is in support of an application by the United States of America for a search warrant for Google LLC at 1600 Amphitheatre Parkway, Mountain View, CA 94043, as described in Attachment A, to search the following email account:

**expliamdavis@gmail.com**

(hereinafter "Subject Account") from January 1, 2021, to May 17, 2021, for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 21, United States Code, Sections 841(a)(1), 846 (Conspiracy to Distribute Controlled Substances), as described in Attachment B. This affidavit and application are sought pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(a) and (b), which applies to providers of electronic communication and remote computing services.

2.    The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of victims; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. All dates, times, and amounts discussed herein are approximate.

## EXPERIENCE & TRAINING

3.    I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since January 2007. I am currently assigned to the San Diego Division, working as a member of the Organized Crime squad. Prior to my employment with the FBI, I was a police officer with the Bloomington, Illinois, Police Department for

approximately three years. I received basic narcotic enforcement training while attending the Illinois Police Training Institute, for 12 weeks, in Champaign, Illinois. During my time as a police officer, I received several hours of specialized narcotic enforcement training. I also had the opportunity to investigate and take part in several narcotic investigations. In addition to the training I received as a police officer, I also received extensive investigative training while attending the FBI Academy at Quantico, Virginia, for 21 weeks.

4.  Since becoming an FBI Special Agent, I have investigated all aspects of criminal organizations to include narcotics trafficking, money laundering, and the operation of illegal gambling businesses. I have interviewed and operated informants, executed search warrants, arrested and interviewed subjects, conducted physical surveillances, utilized electronic and video surveillance, and testified in federal and state courts. I have led and participated in investigations involving the use of electronic surveillance techniques to include, but not limited to, court-authorized wire intercepts; video surveillance; global positioning satellite ("GPS") trackers; and body-worn monitoring devices. These investigations have included violations of statutes listed under Titles 18, 21, 31, and 49 of the United States Code as well as violations under California state law. As a result of these investigations, I have reviewed conversations of hundreds of individuals involved in both drug trafficking and the laundering of illicit proceeds. From my training and experience, I have become familiar with the techniques and methods utilized by criminal organizations.

5.  I have conducted and participated in investigations concerning the identification of co-conspirators through telephone records and bills, financial documents, drug ledgers, photographs, and other documents. I have also participated in and conducted debriefs of individuals who were arrested and later cooperated with law enforcement. I have led and participated in investigations in which the court-authorized interception of communications or other electronic surveillance tools were utilized to further the investigation. In that regard, my involvement has included writing Title III affidavits and

search warrants for email accounts and the GPS pings of cellular phones based off information gleaned from Title III intercepts, assisting with surveillance, reviewing intercepted communications, and preparing written reports resulting from my observations.

6.    Based on my training and experience, I am familiar with the methods of operation of drug smuggling organizations, including their methods of distribution, storage, and transportation of illicit drugs, their methods of collecting proceeds of drug trafficking, and their methods of laundering money to conceal the nature of the proceeds. During the course of my employment, I have also become familiar with the ordinary meaning of controlled substance slang and jargon, packaging methods, consuming and transferring of controlled substances, and I am familiar with the manners and techniques of traffickers in cocaine, methamphetamine, heroin, fentanyl, and marijuana.

7.    In addition to above-stated training and experience, I have also worked with and consulted numerous agents and law enforcement officers who have investigated criminal organizations throughout the United States, including Southern California, as well as transnational organized crime groups. Additionally, I have received training focusing on criminal enterprises and tactics utilized by the enterprise to generate and facilitate illicit funds.  Those tactics include narcotics trafficking, illegal gambling and bribery.  I have also attended training that focused on the laundering of illicit funds. Additionally, I have participated in numerous working group meetings which focused on transnational organized crime and the various methods used to facilitate transnational organized crime. In additional to formal training, I have consulted with various experienced law enforcement officers who are trained in the abovementioned topics. Furthermore, I have had numerous discussions with senior law enforcement officers and agents specializing in maritime and aviation-based drug smuggling organizations. Through these investigations and training, I am familiar with the operations of drug trafficking and money laundering organizations in the United States and abroad.

8.    My experience as a law enforcement officer, both as a police officer and as a

SA with the FBI; my participation in numerous criminal organization investigations; my conversations with other SAs of the FBI, SAs of the Drug Enforcement Administration (DEA), and other law enforcement officers familiar with narcotics trafficking, money laundering, and transnational organized crime; and my training form the basis of the opinions and conclusions set forth below which I drew from the facts set forth herein.

## STATEMENT OF PROBABLE CAUSE

**A.    Background on Criminal Use of Hardened Encrypted Devices**

9.    In 2017, FBI San Diego began investigating a company named Phantom Secure which provided hardened encrypted devices.[1] The investigation revealed Phantom Secure sold its encrypted devices exclusively to members of criminal organizations. The company targeted its customer base to transnational criminal organizations ("TCOs") (primarily drug traffickers) and provided an array of services intended to impede law enforcement's ability to legally surveil their communications and collect evidence of criminal activities. The investigation uncovered the use of Phantom Secure devices all around the world by criminal syndicates.

10.    In March 2018, a grand jury in the Southern District of California returned an indictment against the CEO of Phantom Secure, Vincent Ramos, and four other principals of the company, charging them with violating RICO and aiding and abetting the

---

[1] A "hardened encrypted device" is a communication device that (1) sends and receives encrypted electronic communications, and/or (2) encrypts the data stored on the device. Like other competitor brands of hardened encrypted devices, Phantom Secure's devices had limited functionality: a user could not make a normal phone call or browse the internet. Phantom Secure provided encryption service plans lasting from two to six months, and devices cost $1,500 to $2,000 each for a six month service plan. Devices could not be purchased in a regular store or online; would-be users needed to have a connection to a known distributor to even begin the initial conversation to obtain a device. Users of Phantom Secure devices operated in a closed loop system; that is, device-to-device communication was limited to a self-selected closed group of individuals using only other Phantom Secure devices.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-4-

distribution of cocaine. Ramos was arrested in March 2018.[2] On October 2, 2018, Ramos pled guilty to the Indictment. During his change of plea hearing, Ramos admitted Phantom Secure (1) aided and abetted the importation, exportation, and distribution of illegal drugs throughout the world; (2) obstructed justice through the destruction and concealment of evidence from law enforcement; and (3) laundered drug trafficking proceeds. Ramos was sentenced to nine years in prison and ordered to forfeit $80,000,000.00 in assets which constituted the proceeds of this criminal activity.

11.     Because hardened encrypted devices provide an impenetrable shield against law enforcement surveillance and detection, it is a service in high demand by TCOs. Encrypted communications service providers other than Phantom Secure exist in the market and continue to thrive. Based on my training and experience, I am aware that the continued demand for these encrypted device platforms by criminals is significant. It is primarily driven by the requirements for organized crime, and especially TCOs, to have a trusted method of communications they regard as secure and immune from law enforcement surveillance and interception techniques. TCOs are the target market for this technology because the entire success of their illicit activity is premised on avoiding law enforcement detection. Drug trafficking in particular relies on international, real time coordination by multiple actors. The huge illicit profits in the international drug trade mean they are both willing and able to pay $2000 for a device which has a singular function—sending secure, encrypted messages—in a closed-loop environment. The Phantom Secure investigation showed that hardened encrypted devices are not known to be used by privacy-minded individuals because of the devices' limited functionality and the high cost of a single device.

---

[2] Ramos' arrest resultantly shut down Phantom Secure. In the time since Ramos' arrest, the FBI has not identified a single legitimate, non-criminal user of Phantom Secure. The FBI provided opportunities for any user of a Phantom Secure device to come forward and retrieve their data. No request was made by any Phantom Secure user to the FBI.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-5-

## B. A CHS Gave FBI An In-Development Encrypted Device Company

12. After Ramos was arrested, San Diego FBI agents recruited a Confidential Human Source ("CHS")[3] who had been developing the "next generation" encrypted communications product, poised to compete for market share against established hardened encrypted device competitors. At the time, the void created by Phantom Secure's dismantlement provided a new opportunity for criminal users to switch to a new, secure brand of device. The CHS previously distributed both Phantom Secure and Sky Global[4] devices to TCOs and had invested a substantial amount of money into the development of a new hardened encrypted device. The CHS offered this next generation device, named "Anom," to the FBI to use in ongoing and new investigations. The CHS also agreed to offer  to distribute Anom devices to some of the CHS's existing network of distributors of encrypted communications devices, all of whom have direct links to TCOs. Because encrypted communications devices exist to eschew law enforcement, the distribution of these devices is predicated on trust. This shadowy distribution system is designed, in part, to impede law enforcement's ability to obtain the content from these devices. To prevent law enforcement from obtaining devices, the Phantom Secure investigation revealed that oftentimes, a distributor must vet would-be purchasers of these devices. This vetting

---

[3] The CHS has been working for FBI agents since 2018 in exchange for the possibility of having a reduced sentence in relation to charges the CHS is facing. The CHS has been paid $120,000 by the FBI for services and $59,508 for expenses related to living and travel expenses. The information and services provided by the CHS in this case are considered reliable because in part, they have been corroborated by recorded communications, interviews, and business records. The CHS has a previous conviction for importing narcotics, for which the CHS was sentenced to six years in prison.

[4] On March 12, 2021, a Grand Jury in the Southern District of California returned an indictment against Sky Global CEO Jean Francois EAP and one of Sky's distributors, Thomas Herdman, which charged a RICO conspiracy predicated on aiding and abetting drug trafficking and obstruction of justice. The announcement of the charges and the service of seizure warrants on Sky Global's infrastructure resultantly shut down Sky Global.

process comes from either a personal relationship or reputational access with a purchaser premised on prior/current criminal dealings. By introducing Anom to the CHS's trusted distributors, who were likewise trusted by criminal organizations, the FBI aimed to grow the use of Anom organically through these networks.

13. The FBI opened a new covert investigation, Operation Trojan Shield, which centered on exploiting Anom by inserting it into criminal networks and working with international partners, including the Australian Federal Police ("AFP"), to monitor the communications. Before the device could be put to use, however, the FBI, AFP, and the CHS built a master key into the existing encryption system which surreptitiously attaches to each message and enables law enforcement to decrypt and store the message as it is transmitted. A user of Anom is unaware of this capability. By design, as part of the Trojan Shield investigation, for devices located outside of the United States,[5] an encrypted "BCC" of the message is routed to an "iBot" server located outside of the United States, where it is decrypted from the CHS's encryption code and then immediately re-encrypted with FBI encryption code. The newly encrypted message then passes to a second FBI-owned iBot server, where it is decrypted and its content available for viewing in the first instance.

14. Each Anom user is assigned to a particular Jabber Identification ("JID") by the CHS or an Anom Administrator. A JID is akin to a "PIN" in Blackberry Messenger. The JID is either a fixed, unique alphanumeric identification, or for more recent devices, a combination of two English words. Anom users can select their own usernames and can change their list of usernames over time. As part of the Trojan Shield investigation, the FBI maintains a list of a JIDs and corresponding screen names of Anom users.

**C. The CHS's Criminal Distributors Get Anom Devices to Only TCOs**

15. The CHS has controlled the distribution of Anom devices in consultation with the FBI. Beginning in October 2018, the CHS began offering these devices to three former

---

[5] As explained further herein, devices located in the United States are not obtained by the second FBI-owned server because the U.S. is geo-fenced.

Phantom distributors with connections to criminal organizations, primarily in Australia. These three individuals, relying on their expertise from distributing Phantom, and seeing a huge payday, agreed. For this initial "beta test," AFP obtained a court order to legally monitor the Anom devices of the individuals in Australia or with a clear nexus to Australia. Approximately fifty devices were distributed as part of the beta test, and it was a success. Through the interception of these communications, the AFP penetrated two of the most sophisticated criminal networks in Australia. The AFP has shared generally with San Diego FBI the nature of conversations occurring over Anom,[6] which included drug trafficking activity (including discussing the transportation of hundreds of kilograms of narcotics), firearms purchases, and other illegal activity. Moreover, as the FBI saw with Phantom Secure, according to Australian law enforcement, 100% of Anom users in the test phase used Anom to engage in criminal activity. Intercepted conversations have also detailed a willingness among TCO members to provide these devices to senior members of organized crime groups who reside outside of Australia.

16.    The growth of devices in Australia was initially slow. It grew organically based on word of mouth from the CHS's criminal distributors and other end-users. Growth ramped up by the summer of 2019. During the successful test in Australia, the CHS saw an increase in demand for devices both inside and outside of Australia. The CHS—in coordination with the FBI—began increasing the distribution of devices to other criminal associates in the CHS's distribution network. Australia continued to monitor these communications.

17.    But the FBI itself was not yet reviewing any of the decrypted content of Anom's criminal users. Also by summer of 2019, the investigative team engaged representatives from a third country to receive an iBot server of its own and obtain the contents of communications occurring between Anom users. Negotiations about the

---

[6] Australia's judicial order to intercept Anom communications did not allow for the sharing of the content with foreign partners.

1   logistics and legal framework in the third country progressed throughout fall 2019. The

2   third country agreed to obtain a court order in accordance with its own legal framework to

3   copy an iBot server located there and provide a copy to the FBI pursuant to a Mutual Legal

4   Assistance Treaty ("MLAT"). Unlike the Australian beta test, the third country would not

5   review the content in the first instance. FBI geo-fenced the U.S., meaning that any outgoing

6   messages from a device with a U.S. MCC would not have any communications on the FBI

7   iBot server. But if any devices landed in the United States, the AFP agreed to monitor

8   these devices for any threats to life based on their normal policies and procedures.

9       18.    In October 2019, the third country obtained a court order which enabled the

10  copying of the iBot server and the receipt of its contents every two to three days. The initial

11  MLAT between the U.S. and the third country authorized FBI to receive data from October

12  7, 2019, through January 7, 2020. Due to technological issues with decryption and putting

13  the content into a usable format, the FBI did not begin receiving the actual server content

14  from the third country until October 21, 2019. By this time, there were several hundred

15  users of Anom, with the majority still located in Australia. Since October 2019, the third

16  country has obtained additional court order pursuant to its own laws to copy the iBot server

17  and the United States has obtained the server data pursuant to additional MLATs. The third

18  country provides Anom server data to the FBI every Monday, Wednesday, and Friday, and

19  will continue to do so until the expiration of the third country's court order on June 7, 2021.

20  This data comprises the encrypted messages of all of the users of Anoms with a few

21  exceptions (e.g., the messages of approximately 15 Anom users in the U.S. sent to any

22  other Anom device are not reviewed by FBI).

23      19.    Since October 2019, the FBI has reviewed the content from the iBot server in

24  the third country pursuant to the MLAT. They have translated the messages (where

25  necessary and where translations are available) and have catalogued more than 20 million

26  messages from a total of 11,800 devices (with approximately 9000 active devices currently)

27

28
AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

located in over 90 countries. The following graphic shows the locations of Anom users around the world:



The top five countries where Anom devices are currently used are Germany, the Netherlands, Spain, Australia, and Serbia.

20. The Trojan Shield investigation has uncovered that Anom devices are used by TCOs to traffic drugs and launder the proceeds of those drug sales. The distributors of these devices also obstruct justice by remotely wiping the content of devices when law enforcement seizes them. Additionally, the review of Anom messages has initiated numerous high-level public corruption cases in several countries. The most prominent distributors are currently being investigated by the FBI for participating in an enterprise which promotes international drug trafficking, money laundering, and obstruction of justice. The FBI has identified, with the recent assistance of a Task Force at Europol, over 300 distinct TCOs using Anom, including Italian organized crime, Outlaw Motorcycle Gangs, and various international narcotics source, transportation, and distribution cells. I have reviewed a portion of messages on the Anom platform since October 2019, and I have

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-10-

talked to other FBI agents who have reviewed the content. Based on my familiarity with FBI's the review of content from all international Anom users and my experience investigating transnational criminal organizations, I believe that Anom devices are used exclusively to openly discuss criminal schemes or to maintain relationships in furtherance of those schemes.

21.     The Trojan Shield investigation has unveiled how criminal organizations compartmentalize their activities with multiple brands of hardened encrypted devices. For example, some users assign different types of devices to different parts of a drug trafficking transaction. For example, I have seen conversations where Anom is used for the logistics of the drug shipments, but Ciphr or Sky were used to coordinate the concealment of the illicit proceeds.  This compartmentalization shows the inter-connectivity of the encrypted communications device industry. The interconnectedness was also apparent in the increase in demand when two major platforms were dismantled during the Trojan Shield investigation. First, in July 2020, European investigators announced an investigation into EncroChat which led to its dismantlement. Demand for Anom devices from criminal groups increased after this announcement. Additionally, in March 2021, the announcement of charges against Jean Francois Eap and the dismantlement of Sky Global resulted in a massive increase in demand for Anom devices by criminal organizations. Before Sky's dismantlement, there were approximately 3,000 active Anom users. Since March 12, 2021, as a direct result of the Sky Global charges, there are now close to 9000 active Anom users. The criminals who use hardened encrypted devices are constantly searching for the next secure device, and the distributors of these devices have enabled criminals' impenetrable communications on these devices for years. A goal of the Trojan Shield investigation is to shake the confidence in this entire industry because the FBI is willing and able to enter this space and monitor messages.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-11-

## D.     Examples of Criminal Conversations on Anom

22.     The following conversations area a small but representative sample of the criminal content of that the FBI has reviewed of overseas Anom devices since October 2019.

23.     On January 4, 2020, the user of JID b14f2c, who has been identified through review of Anom messages as Domenico Catanzariti, and JID 31bcf1, who has been identified as Salvatore Lupoi, discussed the cocaine supply of "atlas." Catanzariti said that the batman photo "was all atlas stock" and "Thi[n]k he got it in." Lupoi responded, "Your dreaming. You reckon. What he offer it to you for." Catanzariti then asked what Lupoi meant and whether Atlas sent the same photo in which atlas said it was all his. Lupoi said he never got the photo.  Catanzariti responded that Lupoi was the one who sent it to him one month ago. Catanzariti then sent the following photo to Lupoi of Atlas's supply, which showed hundreds of kilograms of cocaine with a batman label.



Lupoi then asked Catanzariti what price he is telling them for pieces. Catanzariti suggested 150 or 160 (150,000-160,000 AUD/kilogram). Lupoi agreed that 160 maximum was the right price.

24. On March 23, 2020, the user of JID 58f4a9, who has been identified through Anom messages as Baris Tukel, asked the user of JID cfdf8a, who has been identified as Shane Geoffrey May, what the price of cocaine is at the moment. Tukel also asked if May had "that building block address." May replied that cocaine was around the 200k mark and asked if Tukel had some news. Tukel wrote, "Ok sweet, i got a small job that popped up for [t]he building block" and "There is 2kg put inside french diplomatic sealed envelopes out of Bogotta [sic]" and "They have already got a few packages in." Tukel added, "Only issue is that COL takes 50/4 Partners including yourself will need to split other 50" (meaning the Colombian distributors take 50% of the profits while four other people split the other 50%).  Tukel wrote, "They can do it weekely [sic]" (meaning packages containing two kilograms can be sent every week). May responded that this sounded good and he would send the address shortly. Tukel then sent three photos: two of the French diplomatic pouches and one of the available cocaine to send.






After sending the photo of cocaine packages, Tukel wrote, "There waiting to be sent from this crew." Tukel added later in the conversation, "They landed these jobs in brisbane (Australia) already."

25. On May 29, 2020, the user of JID c2c367, with username "Real G" wrote to the user of JID 08511a, with username IRONMAN, "South side asked what the prices [are] in HK [Hong Kong] per piece [kilogram of narcotics]? What's the entry fee? And if they have someone in port to clear it? They secure exit 90% just if Bogota police got info about it then they are above it. Ask HK if they can receive banana cause turbo [Port of Turbo, Colombia] sends banana to HK to will be good if possible cause this will be finished product." IRONMAN responded that he couldn't tell the price per piece in Hong Kong because Hong Kong is very different and said right now the price for a kilogram is Australia

is about 100,000. IRONMAN also said there was "no one in port to clear it" meaning they had no corrupt official available to see the drugs successfully enter. IRONMAN asked how the drugs were hidden in bananas. Real G responded, "They packed the work [narcotics packages] inside the boxes." Real G sent the following photo of narcotics packages (suspected cocaine based on the shape and size) packed into a banana shipment:



Real G added, "They cover this with a layer of banana." They then discussed needing to do a few legitimate shipments "since no one in HK door."

26. In October 2020, a TCO orchestrated a shipment of cocaine from Ecuador to Belgium to be imported via a shipping container concealed within cans of tuna. The FBI reviewed the content of messages from the TCO. Those messages revealed that the TCO discussed the logistics of the importation, and shared container information. This information was passed to U.S. authorities in Brussels, who worked with law enforcement agencies in Belgium to search the suspected container. Upon completion of the search, law enforcement located approximately 613 kilograms of cocaine. Furthermore, information identifying the Ecuadorian tuna company was passed to law enforcement in

Ecuador, which resulted in an additional seizure of approximately 1,523 kilograms of cocaine located in a container destined for Antwerp, Belgium.

 



27.    In April of 2021, a TCO orchestrated a shipment of cocaine (using Anom devices) from Ecuador to Spain to be imported via shipping container concealed within refrigerated fish. The FBI and law enforcement officials in Spain reviewed the messages which contained specific details regarding the shipment and distribution once it arrived in Spain. The suspected container arrived into the Port of Algeciras, Spain on April 29, 2021. Law Enforcement officials in Spain conducted a search of the container and upon completion located approximately 1401 kilograms of cocaine.



28.     In May of 2021, a TCO orchestrated a shipment of cocaine (using Anom devices) from Costa Rica to Spain to be imported via shipping container concealed within hollowed out pineapples.  The FBI and law enforcement officials in Spain reviewed the messages which contained specific details regarding the shipment and distribution once it arrived in Spain.  The suspected container arrived into the Port of Algeciras, Spain on May 12, 2021. Law Enforcement officials in Spain conducted a search of the container and upon completion located approximately 1595 kilograms of cocaine.





29.     The conversations detailed above are a small sample set pulled from more than 20 million messages that FBI reviewed of Anom's criminal users.   From those messages, more than 450,000 photos have been sent detailing conversations on other encrypted platforms discussing criminal activity, cryptocurrency transactions, bulk cash smuggling, law enforcement corruption[7], and self-identification information.     A representative sample of photos has been included below, which includes bulk cash proceeds of illegal transactions, GPS location of narcotics shipments, and discussions of criminal activity on other encrypted devices:

---

[7] Information reviewed on the platform has revealed law enforcement sensitive information passed to TCOs, such as reports and warrants. TCOs have also been notified of anticipated enforcement actions against the TCO or other criminal associates.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-19-











**E.     Identification of the Subject Account and Probable Cause to Search**

30.     On February 25, 2021, JID 11096a (with username TOM FORD) forwarded a message from JID 700204 (with username Sion) that stated, "We are on standbys to receive the package today bro. Tell him the two available addresses for now is the hotel and the mechanic shop. The next mechanic shop and hotel I waiting on final approval to have them on board." Sion responded, "I understand brother, but now I can't send on this two addresses, because it will be more packages to send in same address," "I can send to same address one time every week, in this way it will be safe," "6kgs," and "If I have more addresses I can send more KGS." TOM FORD replied, "Ok my brother we will have don't worry." Sion replied, "Thanks brother, let start work with more KGS brother."

31.     Later in the same conversation, TOM FORD sent two photographs of a commercial invoice to Sion. The invoice appeared to be for a "Chest Seat" sent from "Liam Davis" with address: Lowe's Home Improvement at 2515 Palomar Airport Road, Carlsbad, CA 92008 USA, phone number 760-331-0195, and email address

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

expliamdavis@gmail.com (Subject Account). I am aware that this is the correct address and phone number for a Lowe's store Carlsbad (which is in the Southern District of California). According to Anom metadata records, at the time of this conversation, TOM FORD was likely located in Australia and Sion was likely located in Armenia.




32.     The consignee for the shipment was "Pro Worx Performance" at 288 Princes Hwy, Banksia NSW 2216, Australia with phone number +61-403-305-460. Based on public records, I am aware that there is a mechanic called Pro Worx Performance at 28**6** Princes Hwy with the same telephone number as provided in the consignee information.

33.     After TOM FORD sent these photos, Sion expressed relief "because package is ready I want to send today, I ordered next KGS to prepare for sending." In the same string of messages, TOM FORD and Sion sent photos of cocaine bricks to each other and claimed it was from America and on the way to Europe.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-22-



34.     I believe, based on the content of these conversations and my knowledge of how Anom devices are used, that TOM FORD and Sion coordinated the shipment of likely six kilograms of cocaine from Carlsbad to Australia in February 2021. I believe they also discussed further transactions as soon as additional delivery addresses in Australia could be procured.

35.     Based on the discussions above and other conversations I have reviewed, I believe that this TCO involving TOM FORD and Sion is using shipping information from real businesses to concealing narcotics shipments.  I believe the group will continue utilizing email accounts, including the Subject Account, to transmit invoices, Bill of Lading information, and shipping information and to further coordinate narcotics transactions. The TCO has specifically used the Subject Account in at least one shipment of a suspected cocaine transaction from Carlsbad, California, to Australia.  This email account will likely contain evidence of the TCO's drug trafficking activities in the past and may assist in identifying future shipments and identifying the users of the Subject Account, who are involved in distribution of controlled substances.

36.     I respectfully request permission to obtain the content from the Subject Account from January 1, 2021, to May 17, 2021, because the specific narcotics trafficking

job was first discussed in February 2021 and I have probable cause to believe that evidence, as outlined in Attachment B, may be present from this time period. Based on my training and experience, I am aware that the narcotics concealment methods take many months to accomplish. I am also aware that oftentimes several "dry runs" are tested before any narcotics are actually sent, which still require the use of email correspondence to set up and use as proof of the shipping transaction. These "dry runs" monitor the speed at which a shipment occurs, if there are any issues in customs in the exporting or importing country, and whether the transportation channels are in place. Thus, evidence of planning and preparation may be present on the Subject Account for several months before an actual narcotics shipment is sent. I also respectfully request permission to search the subject account from January 1, 2021, until May 17, 2021, because TOM FORD and Sion alluded to additional kilogram quantity shipments in the future. Based on their conversations over Anom, I believe they or co-conspirators may have continued using the Subject Account for future narcotics transactions.

<u>BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT</u>

37. Based on my training and experience, consultation with other law enforcement officers experienced in international maritime narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that probable cause exists that the Subject Account is being used to conceal the distribution of controlled substances aboard maritime vessels and that the following evidence may be found stored on the premises of Google LLC in relation to the Subject Account:

a. Communications, records, and attachments tending to discuss or establish the creation of businesses, records, invoices, transactions, Bill of Lading information, and shipping information to conceal the distribution of controlled substances or to set up test runs of such shipments;

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-24-

b. Communications, records, and attachments tending to discuss the legitimate cargo or details of the modes of transportation being used conceal the distribution of narcotics or to set up test runs of such shipments;

c. Communications, records, and attachments tending to identify the individuals and locations sourcing the concealed narcotics as well as the recipient individuals and locations and Ports of the concealed narcotics;

d. Communications, records, and attachments tending to identify the users of screen names TOM FORD, Sion, and any co-conspirators (such as Liam Davis) involved in the activities in III(a)-(c) above; and

e. Communications, records, and attachments that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify user(s) of the subject account.

## GENUINE RISKS OF DESTRUCTION OF EVIDENCE

38. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

39. The United States has not attempted to obtain this data by other means.

## THE SERVICE PROVIDER

40. Google LLC is an Internet company that, among other things, provides electronic communication services to its subscribers. Google LLC's electronic mail service (Gmail) allows its subscribers to exchange electronic communications with others through the Internet. ISP subscribers access ISP's services through the Internet.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-25-

41. Subscribers to Google LLC use screen names during communications with others. The screen names may or may not identify the real name of the person using a particular screen name. Although Google LLC requires users to subscribe for a free Google account, Google LLC does not verify the information provided by the subscriber for its free services.

42. At the creation of a Google account and for each subsequent access to the account, Google LLC logs the Internet Protocol ("IP") address of the computer accessing the account. An IP address is a unique address through which a computer connects to the Internet. IP addresses are leased to businesses and individuals by Internet Service Providers. Obtaining the IP addresses that have accessed a particular Google account often identifies the Internet Service Provider that owns and has leased that address to its customer. Subscriber information for that customer then can be obtained using appropriate legal process.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

43. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Google are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Google for the relevant accounts and then to analyze the contents of those accounts on the premises of Google LLC. The impact on Google LLC's business would be disruptive and severe.

44. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the Google account, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Google LLC, to protect the privacy of ISP subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, FBI seeks authorization to allow Google LLC to make a digital copy of the entire contents of the

account subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

45. Analyzing the data to be provided by Google LLC may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

46. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete

the analysis within ninety (90) days of receipt of the data from the service provider, absent

further application to this court.

47.    Based upon my experience and training, and the experience and training of

other agents with whom I have communicated, it is necessary to review and seize all

electronic mails that identify any users of the Subject Account and any electronic mails

sent or received in temporal proximity to incriminating electronic mails that provide

context to the incriminating mails.

48.    All forensic analysis of the imaged data will employ search protocols directed

exclusively to the identification and extraction of data within the scope of this warrant.

<u>REQUEST FOR SEALING & PRECLUSION OF NOTICE</u>

49.    This is an ongoing investigation of which the targets are unaware.

Specifically, this sophisticated, covert FBI investigation is currently operating in over 90

countries. The FBI is targeting almost two dozen of the Anom platform's Administrators

and Distributors its investigation. Other countries have opened investigations into the

criminal end users of these devices. The Subject Account is directly connected to a target

of the FBI's investigation. The Trojan Shield investigation is anticipated to be concluded

at the expiration of the third country's warrant period on June 7, 2021, and the investigation

will be publicly announced on June 8, 2021. Until then, the continued success of the

investigation depends on maintaining the secrecy of the FBI's role in Anom. If notice of

this warrant were served on the user and/or subscriber of the Subject Account immediately,

it could result in flight from prosecution of the user of the subject account and his co-

conspirators, destruction of evidence (including many encrypted devices), or otherwise

seriously jeopardize the ongoing investigation by compromising the trust that the targets

of the investigation have put into the device. Additionally, it is believed that premature

disclosure could endanger the life and safety of the CHS.  It is very likely, based upon the

above, that evidence of the crimes under investigation exists on computers and devices

subject to the control of the targets.  There is reason to believe, based on the above, that

1 premature disclosure of the existence of the warrant will result in destruction or tampering
2 with that evidence and seriously jeopardize the success of the investigation. Accordingly,
3 it is requested that this warrant and its related materials be sealed until June 7, 2021, absent
4 further order of the Court.

5    50.    In addition for the same reasons, pursuant to Title 18, United States Code,
6 Section 2705(b), it is requested that this Court order the electronic computing service
7 provider to whom this warrant is directed not to notify anyone of the existence of this
8 warrant, other than its personnel essential to compliance with the execution of this warrant,
9 until June 7, 2021, absent further order of the Court.

10                                CONCLUSION

11    51.    Based on the foregoing, there is probable cause to believe that the items
12 identified in Attachment B have been used in the commission of a crime and constitute
13 evidence, fruits, and instrumentalities of violations of Title 21, United States Code,
14 Sections 841, 846 and will be found at the premises to be searched as provided in
15 Attachment A.

16

17 _____
18 NICHOLAS I. CHEVIRON
   Special Agent
19 Federal Bureau of Investigation

20 Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1
21 by telephone on this 17th day of May, 2021

22

23 _____
24 HON. MICHAEL S. BERG
   U.S. MAGISTRATE JUDGE
25

26

27

28 AFFIDAVIT IN SUPPORT OF APPLICATION          -29-
   FOR SEARCH WARRANT

ATTACHMENT A

     Google LLC is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1600 Amphitheater Parkway, Mountain View, California 94043.

## ATTACHMENT B

**I.**    Service of Warrant

The officer executing the warrant shall permit Google LLC, as custodian of the computer files described in Section II below, to locate the files and deliver digital copies to the officer.

**II**.    Items to be provided by Google LLC

Subscriber and/or user information, electronic mail, images, text messages, histories, phone and VoIP logs, contacts or friend lists, profiles, method of payment, detailed billing records, access logs, backup data, transactional data, and any other files or records associated with the following account and screen name:

**expliamdavis@gmail.com**

**III**.    The search of the data supplied by Google LLC pursuant to this warrant will be conducted by the FBI as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of January 1, 2021, to May 17, 2021, and to the seizure of:

a Communications, records, and attachments tending to discuss or establish the creation of businesses, records, invoices, transactions, Bill of Lading information, and shipping information to conceal the distribution of controlled substances or to set up test runs of such shipments;

b.    Communications, records, and attachments tending to discuss the legitimate cargo or details of the modes of transportation being used conceal the distribution of narcotics or to set up test runs of such shipments;

32

    c.      Communications, records, and attachments tending to identify the individuals and locations sourcing the concealed narcotics as well as the recipient individuals and locations and Ports of the concealed narcotics;

    d.      Communications, records, and attachments tending to identify the users of screen names TOM FORD, Sion, and any co-conspirators (such as Liam Davis) involved in the activities in III(a)-(c) above; and

    e.      Communications, records, and attachments that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify user(s) of the subject account.

**which are evidence of violations of Title 21, United States Code, Sections 841(a)(1), 846.**

Welcome to the new look of justice.gov. In the coming months you'll see more pages in
this new design. Please share your feedback with our webmaster.                                    ✕

 An official website of the United States government
Here's how you know



☰
Menu

Search                                                                                     🔍

**PRESS RELEASE**

# FBI's Encrypted Phone Platform Infiltrated Hundreds of Criminal Syndicates; Result is Massive Worldwide Takedown

Tuesday, June 8, 2021

Share

## For Immediate Release

U.S. Attorney's Office, Southern District of California

### For Further Information, Contact:

### Media Relations Director Kelly Thornton (619) 546-9726

SAN DIEGO – A wave of hundreds of arrests that began in Australia and stretched across Europe
culminated today with the unsealing of a federal grand jury indictment in San Diego charging 17
foreign nationals with distributing thousands of encrypted communication devices to criminal
syndicates.

The 500-plus arrests that took place during a worldwide two-day takedown were possible
because of a San Diego-based investigation like no other. For the first time, the FBI operated its
own encrypted device company, called "ANOM," which was promoted by criminal groups
worldwide. These criminals sold more than 12,000 ANOM encrypted devices and services to

34

6/22/23, 2:15 PM    Southern District of California | FBI's Encrypted Phone Platform Infiltrated Hundreds of Criminal Syndicates; Result is Massive Worldwide Tak…

Case 3:21-cr-01623-JLS   Document 161   Filed 07/20/23   PageID.666   Page 56 of 67

more than 300 criminal syndicates operating in more than 100 countries, including Italian organized crime, Outlaw Motorcycle Gangs, and various international drug trafficking organizations, according to court records.

**SEARCH WARRANT - Operation Trojan Shield**

**INDICTMENT - Operation Trojan Shield**



During the course of the investigation, while ANOM's criminal users unknowingly promoted and communicated on a system operated lawfully by the FBI, agents catalogued more than 27 million messages between users around the world who had their criminal discussions reviewed, recorded, and translated by the FBI, until the platform was taken down yesterday.

The users, believing their ANOM devices were protected from law enforcement by the shield of impenetrable encryption, openly discussed narcotics concealment methods, shipments of narcotics, money laundering, and in some groups — violent threats, the indictment said. Some users negotiated drug deals via these encrypted messages and sent pictures of drugs, in one instance hundreds of kilograms of cocaine concealed in shipments of pineapples and bananas, and in another instance, in cans of tuna, in order to evade law enforcement.

The indictment charges 17 alleged distributors of the FBI's devices and platform. They are charged with conspiring to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), pertaining to their alleged involvement in marketing and distributing thousands of encrypted communication devices to transnational criminal organizations worldwide.

During the last 24 to 48 hours, in addition to the more than 500 arrests around the world, authorities searched more than 700 locations deploying more than 9,000 law enforcement officers worldwide and seized multi-ton quantities of illicit drugs.

## CLICK HERE - Video Messages from International Partners

Grand totals for the entire investigation include 800 arrests; and seizures of more than 8 tons of cocaine; 22 tons of marijuana; 2 tons of methamphetamine/amphetamine; six tons of precursor chemicals; 250 firearms; and more than $48 million in various worldwide currencies. Dozens of public corruption cases have been initiated over the course of the investigation. And, during the course of the investigation, more than 50 clandestine drug labs have been dismantled. One of the labs hit yesterday was one of the largest clandestine labs in German history.

"This was an unprecedented operation in terms of its massive scale, innovative strategy and technological and investigative achievement," said Acting U.S. Attorney Randy Grossman. "Hardened encrypted devices usually provide an impenetrable shield against law enforcement surveillance and detection. The supreme irony here is that the very devices that these criminals were using to hide from law enforcement were actually beacons for law enforcement. We aim to shatter any confidence in the hardened encrypted device industry with our indictment and announcement that this platform was run by the FBI."





"Today marks the culmination of more than five years of innovative and complex investigative work strategically aimed to disrupt the encrypted communications space that caters to the criminal element," said Suzanne Turner, Special Agent in Charge of the Federal Bureau of Investigation (FBI) - San Diego Field Office. "The FBI has brought together a network of dedicated international law enforcement partners who are steadfast in combating the global threat of organized crime. The immense and unprecedented success of Operation Trojan Shield should be a warning to international criminal organizations  –your criminal communications may not be secure; and you can count on law enforcement worldwide working together to combat dangerous crime that crosses international borders."

"Operation Trojan Shield is a perfect example of an OCDETF case - an investigation driven by intelligence and maximizing the strengths of partner law enforcement agencies in coordinated efforts to dismantle command and control elements of criminal networks," said OCDETF Director Adam W. Cohen.  "Coordination is the cornerstone of the OCDETF program, and the impressiveness of the combined efforts of the U.S. Attorney's Office, FBI, and our foreign partners cannot be overstated.  This effort has created lasting disruptive impacts to these transnational criminal organizations."

"The AFP and FBI have been working together on a world-first operation to bring to justice the organised crime gangs flooding our communities with drugs, guns and violence," said AFP Commissioner Reece Kershaw APM. "The FBI provided an encrypted communications platform while the AFP deployed the technical capability which helped unmask some of the biggest criminals in the world. This week the AFP and our state police partners will execute hundreds of warrants and we expect to arrest hundreds of offenders linked to the platform. This is the culmination of hard work, perseverance and an invaluable, trusted relationship with the FBI.

We thank the FBI for their long and integral partnership with the AFP."

Europol's Deputy Executive Director Jean-Philippe Lecouffe: "This operation is an exceptional success by the authorities in the United States, Sweden, the Netherlands, Australia, New Zealand and the other European members of the Operational Task Force. Europol coordinated the international law enforcement community, enriched the information picture and brought criminal intelligence into ongoing operations to target organised crime and drug trafficking organisations, wherever they are and however they choose to communicate. I am very satisfied to see Europol supporting this operation and strengthen law enforcement partnerships by emphasizing the multi-agency aspect of the case."

6/22/23, 2:15 PM    FBI's Encrypted Phone Platform Infiltrated Hundreds of Criminal Syndicates; Result is Massive Worldwide Tak…

Case 3:21-cr-01623-JLS   Document 161   Filed 07/20/23   PageID.670   Page 60 of 67



"I am exceptionally proud of our New Zealand Police staff who supported Operation Trojan Shield," said New Zealand Police Commissioner Andrew Coster. "This operation will have an unprecedented impact on organised crime syndicates across the globe. We value our strong relationship with the FBI, AFP and Europol and it is through these partnerships and the unrelenting efforts by law enforcement agencies from multiple countries that this operation has seen such incredible success This is a fantastic result and reiterates the importance of our transnational partnerships with law enforcement agencies across the globe in our common ongoing efforts to dismantle organised crime groups and the enormous harm they cause to our communities."

"This remarkably successful operation demonstrates what can be accomplished when law enforcement agencies throughout the world work together," said DEA Los Angeles Division Special Agent in Charge Bill Bodner. "Through strong relationships with our partners in more than 67 countries, professionals throughout the DEA, including experts in the Los Angeles Division, supported this unprecedented collaboration and our own mission to disrupt and dismantle the criminal organizations that profit from the distribution of illegal drugs."

According to the San Diego indictment, ANOM's administrators, distributors, and agents described the platform to potential users as "designed by criminals for criminals" and targeted the sale of ANOM to individuals that they knew participated in illegal activities.



All defendants are foreign nationals located outside of the U.S. In total, eight of the indicted defendants were taken into custody last night. Authorities are continuing to search for the remaining nine defendants.

The indictment alleges the defendants knew the devices they distributed were being used exclusively by criminals to coordinate drug trafficking and money laundering, including in the U.S. The defendants personally fielded "wipe requests" from users when devices fell into the hands of law enforcement.

The FBI's review of ANOM users' communications worked like a blind carbon copy function in an email. A copy of every message being sent from each device was sent to a server in a third-party country where the messages were collected and stored. The data was then provided to the FBI on a regular basis pursuant to an international cooperation agreement. Communications such as text messages, photos, audio messages, and other digital information were reviewed by the FBI for criminal activity and disseminated to partner law enforcement agencies in other countries. Each user was using ANOM for a criminal purpose. Those countries have built their own cases against ANOM users, many of whom were arrested in takedowns in Europe, Australia and New Zealand over the last several days.

Intelligence derived from the FBI's communications platform presented opportunities to disrupt major drug trafficking, money laundering, and other criminal activity while the platform was active. For example, over 150 unique threats to human life were mitigated.

This operation was led by the FBI and coordinated with the U.S. Drug Enforcement Administration, the U.S. Marshals Service, Australian Federal Police, Swedish Police Authority, National Police of the Netherlands, Lithuanian Criminal Police Bureau, Europol, and numerous other law enforcement partners from over a dozen other countries.

This investigation began after Canada-based encrypted device company Phantom Secure was dismantled by the FBI in 2018 through a San Diego-based federal RICO indictment and court-authorized seizure of the Phantom Secure platform, forcing many criminals to seek other secret communication methods to avoid law enforcement detection. The FBI — along with substantial contributions by the Australian Federal Police — filled that void with ANOM.

40

When the FBI and the San Diego U.S. Attorney's Office dismantled Sky Global in March 2021, the demand for ANOM devices grew exponentially as criminal users sought a new brand of hardened encryption device to plot their drug trafficking and money laundering transactions and to evade law enforcement. Demand for ANOM from criminal groups also increased after European investigators announced the dismantlement of the EncroChat platform in July 2020. The ANOM platform - unlike Phantom Secure, EncroChat, and Sky Global - was exploited by the FBI from the very beginning of ANOM's existence and was not an infiltration of an existing popular encrypted communications company.

In October 2018, Phantom Secure's CEO pleaded guilty to a RICO conspiracy in the Southern District of California. He was sentenced to nine years in prison and ordered to forfeit $80 million in proceeds from the sale of Phantom devices.

For further information, please see https://www.justice.gov/usao-sdca/pr/chief-executive-communications-company-sentenced-prison-providing-encryption-services and https://www.justice.gov/usao-sdca/pr/sky-global-executive-and-associate-indicted-providing-encrypted-communication-devices.

Operation Trojan Shield is an Organized Crime Drug Enforcement Task Forces (OCDETF) investigation. OCDETF identifies, disrupts, and dismantles the highest-level drug traffickers, money launderers, gangs, and transnational criminal organizations that threaten the United States by using a prosecutor-led, intelligence-driven, multi-agency approach that leverages the strengths of federal, state, and local law enforcement agencies against criminal networks.

Assistant U.S. Attorneys Meghan E. Heesch, Joshua C. Mellor, Shauna Prewitt, and Mikaela Weber of the U.S. Attorney's Office for the Southern District of California are prosecuting the case, with assistance from Paralegal Specialist Tracie Jarvis. Former Assistant U.S. Attorney Andrew P. Young made invaluable contributions during his tenure on the case team.

Acting U.S. Attorney Grossman praised federal prosecutors and FBI agents and international law enforcement partners for their relentless pursuit of justice in this extraordinary case. Additionally, Acting U.S. Attorney Grossman thanked the coordinated efforts of the Department of Justice's Office of International Affairs which facilitated many international components of this complex investigation.

The charges and allegations contained in an indictment are merely accusations, and the defendants are considered innocent unless and until proven guilty.

**DEFENDANTS  21-CR-1623-JLS**                    **COUNTRY**

*Joseph Hakan Ayik (1)

| DEFENDANTS  21-CR-1623-JLS | COUNTRY |
|---|---|
| Domenico Catanzariti (2) | Australia |
| *Maximilian Rivkin (3) | |
| Abdelhakim Aharchaou (4) | The Netherlands |
| *Seyyed Hossein Hosseini (5) | |
| Alexander Dmitrienko (6) | Spain |
| *Baris Tukel (7) | |
| *Erkan Yusef Dogan (8) | |
| *Shane Geoffrey May (9) | |
| Aurangzeb Ayub (10) | The Netherlands |
| James Thomas Flood (11) | Spain |
| *Srdjan Todorovic aka Dr. Djek (12) | |
| *Shane Ngakuru (13) | |
| Edwin Harmendra Kumar (14) | Australia |
| Omar Malik (15) | The Netherlands |
| Miwand Zakhimi (16) | The Netherlands |
| *Osemah Elhassen (17) | |

*Fugitive

## SUMMARY OF CHARGES

42

Conspiracy to Conduct Enterprise Affairs Through Pattern of Racketeering Activity (RICO Conspiracy), in violation of 18 U.S.C. § 1962(d)

Maximum Penalty: Twenty years in prion

## AGENCIES

Federal Bureau of Investigation

Drug Enforcement Administration

United States Marshals Service

Department of Justice, Office of International Affairs

Australian Federal Police

Swedish Police Authority

Lithuanian Criminal Police Bureau

National Police of the Netherlands

EUROPOL

**For further information, please see**

https://www.europol.europa.eu/newsroom/news/800-criminals-arrested-in-biggest-ever-law-enforcement-operation-against-encrypted-communication

https://www.afp.gov.au/news-media/media-releases/afp-led-operation-ironside-smashes-organised-crime

*Updated June 8, 2021*

**Components**

Federal Bureau of Investigation (FBI)

USAO - California, Southern

Press Release Number: CAS21-0608-TrojanShield

43



**U.S. Department of Justice**

*RANDY S. GROSSMAN*
*United States Attorney*
*Southern District of California*

*Joshua C. Mellor*                                                          *(619) 546-9733*
*Assistant U.S. Attorney*

---

*San Diego County Office*                                    *Imperial County Office*
*Federal Office Building*                                     *516 Industry Way*
*880 Front Street, Room 6293*                            *Suite C*
*San Diego, California  92101-8893*                     *Imperial County, California 92251-5782*

7 November 2022

Anna-Riikka Ruuth
Senior Specialized Prosecutor
National Prosecution Authority, Southern District
Porkkalankatu 13, 00180 Helsinki, Finland

Dear Ms. Ruuth:

Operation Trojan Shield's technique of operating the Anom platform was lawful under the laws of the United States and where the platform was hosted. The vast majority of individuals who used Anom were not United States citizens and were not located in the United States. The United States Constitution's Fourth Amendment does not apply to these individuals. Additionally, none of the messages exchanged only between foreign users traversed United States infrastructure, so they did not implicate the Wiretap Act, 18 U.S.C. §§ 2510 et seq.

The third country that hosted the Anom server is in the European Union and the third country utilized its own judicial process to obtain a court order authorizing the copying of messages routed to the server. The third country provided the messages to the Federal Bureau of Investigation pursuant to a Mutual Legal Assistance Treaty request. Because the third country followed its laws, the United States can rely on the data obtained regarding communications between foreign users.

Sincerely

*s/ Joshua C. Mellor*
Joshua C. Mellor
Assistant U.S. Attorney
Southern District of California

M Gmail

**Devin Burstein** <db@wabulaw.com>

---

## Discovery in 21-cr-01623-JLS, U.S. v. Kumar

**Devin Burstein** <db@wabulaw.com>                                          Fri, Jun 23, 2023 at 12:14 PM
To: Joshua.Mellor@usdoj.gov
Cc: Victor Sherman <victor@victorsherman.law>, "Griffin Law Office, APC" <patrick@griffinlawoffice.com>, John Ellis
<john@johnellislaw.com>
Bcc: Devin Burstein <db@wabulaw.com>

Hi Josh,

I hope all is well. I'm working with Victor Shermin on this case.

Victor told me that he and Patrick Griffin had already requested the government provide
discovery related to the third-party country that hosted the FBI's iBot server.  Victor
further told me you declined to provide any such information, including as to the
identity of the country.  Can you please confirm?

In the interest of clarity, what the defense is currently requesting related to the third
country is:

1. The identity of the third country hosting the "iBot" server.

2. The location within the country of the "iBot" server.

3.  The agency or agencies within the country with whom the U.S. government
coordinated its efforts.

4.  All communications between the U.S. government and the third country
regarding the Anom program, including the placement of the "iBot" server, and
the capture, retention, and dissemination of the content on the server.

5.  The final agreement and any draft agreements between the U.S. government
and the third country related to the Anom program and the "iBot" server.

All of this information is material to defense preparation and thus discoverable
under Rule 16.  At a minimum, it will assist the defense in terms of generating
letters rogatory, conducting an independent defense investigation, locating
witnesses, raising evidentiary challenges to the data on the iBot server in limine
and at trial, preparing a motion to suppress, and other potential motions.

In addition, the government's filings in this case indicate that, during the Anom program, it has "catalogued more than 20 million messages from a total of 11,800 devices . . . located in over 90 countries." We request the government provide all of these messages in their native format with all metadata. Plainly, this is material to defense preparation because the messages are at the heart of this case. And as the Ninth Circuit has held, "[e]ven *inculpatory* evidence may be relevant. A defendant who knows that the government has evidence that renders his planned defense useless can alter his trial strategy. Or he can seek a plea agreement instead of going to trial." *United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013).

Finally (at least for now), and as specifically related to Mr. Kumar, the indictment alleges he was "a Distributor of the Anom network to criminal end-users." Please provide all information as to the identity of those alleged criminal end-users, the devices they used, as well as all messages allegedly sent or received by those end-users, along with all messages attributed to, or received by, Mr. Kumar.

Thank you very much and have a nice weekend. I'm happy to discuss this with you further at your convenience.

p.s. I have CCed Victor, Patrick, and John Ellis on this email, in case they have additional thoughts.

---
Devin Burstein
Warren & Burstein
501 W. Broadway, Suite 240
San Diego, Ca., 92101
(619) 234-4433
warrenburstein.com