RANDY S. GROSSMAN
United States Attorney
JOSHUA C. MELLOR
California Bar No. 255870
MIKAELA L. WEBER
California Bar No. 279391
PETER S. HORN
California Bar No. 321358
New York Bar No. 5333653
Assistant U.S. Attorneys
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel: 619-546-9733/9734/6795
joshua.mellor@usdoj.gov
mikaela.weber@usdoj.gov
peter.horn@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 21-CR-1623-JLS |
| Plaintiff, | **UNITED STATES' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR DISCOVERY AND RETURN OF PROPERTY** |
| v. | |
| SEYYED HOSSEIN HOSSEINI (5),<br>ALEXANDER DMITRIENKO (6),<br>AURANGZEB AYUB (10),<br>EDWIN HARMENDRA KUMAR (14),<br> aka Edwin Harmendra Valentine,<br>OSEHAH ELHASSEN (17), | Date: August 23, 2023<br>Time: 9:00 a.m.<br>Courtroom: 4D<br>Honorable Janis L. Sammartino |
| Defendants. | |

1

## **TABLE OF CONTENTS**

I.    INTRODUCTION                                                                          1

II.   BACKGROUND                                                                            1

      A.    Background on Criminal Use of Hardened Encrypted Devices          1

      B.    A CHS Gave FBI An In-Development Encrypted Device Company         3

      C.    Relevant Procedural Background in This Case                      5

III.  ARGUMENT                                                                              8

      A.    Legal Framework for Discovery                                    8

      B.    Responses to Defendants' Discovery Motions                      10

            1.    Information About the Third Country                       11

                  a.    Defendants' Requests and the Government's Disclosure   11

                  b.    The Information Defendants Seek Is Immaterial Because
                        the Fourth Amendment Does Not Apply and Law
                        Enforcement's Investigation Does Not Shock the
                        Conscience                                           12

                        (i)   Legal Framework                               13

                        (ii)  Defendants Have No Legal Authority for
                              Their Position                                18

                  c.    Third Country Information Is Not Material to Further
                        Investigation or a Suppression Motion on Other Grounds   27

            2.    Requests for Information About Distribution of Devices    29

            3.    Requests To Inspect Anom Devices, Network, and Materials  33

                  a.    The Asserted Basis for Defendants' Requests, and the
                        Government's Disclosure                             33

                  b.    Defendants Have Not Shown Materiality               34

                  c.    Defendants' Requests Are Premature, at Best         36

            4.    Ayub's Request To Return Luxury Watches                   37

            5.    Elhassen's Remaining Requests                             39

IV.   CONCLUSION                                                                            40

I.   **INTRODUCTION**

Defendants' motions should be denied. The government is willing to provide certain additional discovery, but Defendants'[1] wide-ranging requests seek information that is not material to any potential defense or otherwise subject to disclosure. Indeed, they will have no defense under the Fourth Amendment and no other basis for suppression of the Anom evidence in this case. They also have not shown materiality or other grounds for the types of broad discovery they seek regarding the Anom platform and the third country. Further, Ayub's watches are plainly subject to forfeiture. For all of the reasons set forth below, the Court should reject Defendants' requests here.

II.   **BACKGROUND**

A.   **Background on Criminal Use of Hardened Encrypted Devices**

In 2017, FBI San Diego began investigating a company named Phantom Secure that provided hardened encrypted devices.[2] The investigation revealed Phantom Secure sold its encrypted devices exclusively to members of criminal organizations. The company targeted transnational criminal organizations ("TCOs") (primarily drug traffickers) as its customer base and provided an array of services intended to impede law enforcement's ability to legally surveil their communications and collect evidence of criminal activities.

---

[1] "Defendants" refers to all defendants here who have filed or joined discovery motions—Hosseini, Dmitrienko, Ayub, Kumar, and Elhassen. Elhassen has not joined the other defendants' discovery motions, but for purposes of this response the government uses "Defendants" in reference to all five of them, including Elhassen.

[2] A "hardened encrypted device" is a communication device that (1) sends and receives encrypted electronic communications, and/or (2) encrypts the data stored on the device. Like other competitor brands of hardened encrypted devices, Phantom Secure's devices had limited functionality: a user could not make a normal phone call or browse the internet. Phantom Secure provided encryption service plans lasting from two to six months, and devices cost $1,500 to $2,000 each for a six-month service plan. Devices could not be purchased in a regular store or online; would-be users needed to have a connection to a known distributor to even begin the initial conversation to obtain a device. Users of Phantom Secure devices operated in a closed loop system; that is, device-to-device communication was limited to a self-selected closed group of individuals using only other Phantom Secure devices.

The investigation uncovered the use of Phantom Secure devices all around the world by criminal syndicates.

In March 2018, a grand jury in the Southern District of California returned an indictment against the CEO of Phantom Secure, Vincent Ramos, and four other principals of the company, charging them with violating RICO and aiding and abetting the distribution of cocaine. Ramos was arrested in March 2018.[3] On October 2, 2018, Ramos pled guilty to the indictment. During his change of plea hearing, Ramos admitted Phantom Secure: (1) aided and abetted the importation, exportation, and distribution of illegal drugs throughout the world; (2) obstructed justice through the destruction and concealment of evidence from law enforcement; and (3) laundered drug trafficking proceeds. Ramos was sentenced to nine years in prison and ordered to forfeit $80,000,000 in assets that constituted the proceeds of this criminal activity.

Because hardened encrypted devices provide an impenetrable shield against law enforcement surveillance and detection, they are in high demand by TCOs. Encrypted communications service providers other than Phantom Secure exist in the market and continue to thrive. The market for these devices is primarily driven by the requirements for organized crime, and especially TCOs, to have a trusted method of communications they regard as secure and immune from law enforcement surveillance and interception techniques. TCOs are the target market for this technology because the entire success of their illicit activity is premised on avoiding law enforcement detection. Drug trafficking in particular relies on international, real-time coordination by multiple actors. The huge illicit profits garnered by participants in the international drug trade makes them among the only potential customers who are both willing and able to pay $2,000 for a device that has a singular function—sending secure, encrypted messages in a closed-loop environment. The

---

[3] Ramos's arrest resultantly shut down Phantom Secure. In the time since Ramos's arrest, the FBI has not identified a single legitimate, non-criminal user of Phantom Secure. The FBI provided opportunities for any user of a Phantom Secure device to come forward and retrieve their data. No request was made by any Phantom Secure user to the FBI.

Phantom Secure investigation showed that hardened encrypted devices are not known to be used by law-abiding, privacy-minded individuals because of the devices' limited functionality and the high cost of a single device.

### B. A CHS Gave FBI An In-Development Encrypted Device Company

After Ramos was arrested, San Diego FBI agents recruited a Confidential Human Source ("CHS") who had been developing the "next generation" encrypted communications product that was poised to compete for market share against established hardened encrypted device competitors. At the time, the void created by Phantom Secure's dismantlement provided an opportunity for criminal users to switch to a new, secure brand of device. The CHS had previously distributed both Phantom Secure and Sky Global[4] devices to TCOs and had invested a substantial amount of money into the development of a new hardened encrypted device. The CHS offered this next generation device, named "Anom," to the FBI to use in ongoing and new investigations. The CHS also agreed to offer the opportunity to distribute Anom devices to some of the CHS's existing network of distributors of encrypted communications devices, all of whom have direct links to TCOs. Because encrypted communications devices exist to eschew law enforcement, the distribution of these devices is predicated on trust. This shadowy distribution system is designed, in part, to impede law enforcement's ability to obtain the content from these devices. To prevent law enforcement from obtaining devices, the Phantom Secure investigation revealed that oftentimes, a distributor must vet would-be purchasers of these devices. This vetting process requires that new customers have either a personal relationship or reputational access with a purchaser premised on prior/current criminal dealings. By introducing Anom to the CHS's trusted distributors, who were likewise

---

[4] On March 12, 2021, a grand jury in the Southern District of California returned an indictment against Sky Global CEO Jean Francois EAP and one of Sky's distributors, Thomas Herdman, which charged a RICO conspiracy predicated on aiding and abetting drug trafficking and obstruction of justice. The announcement of the charges and the service of seizure warrants on Sky Global's infrastructure resultantly shut down Sky Global.

trusted by criminal organizations, the FBI aimed to grow the use of Anom organically through these networks.

The FBI opened a new covert investigation, Operation Trojan Shield, which centered on exploiting Anom by inserting it into criminal networks and working with international partners, including the Australian Federal Police ("AFP"), to monitor the communications. Before the device could be put to use, however, the FBI, AFP, and the CHS built a master key into the existing encryption system which surreptitiously attached to each message and enabled law enforcement to decrypt and store the message as it was transmitted. A user of Anom would be unaware of this capability. By design, as part of the Trojan Shield investigation, for devices located outside of the United States, an encrypted "BCC" of the message was to be routed to an "iBot" server located outside of the United States, where it was decrypted from the CHS's encryption code and then immediately re-encrypted with the FBI encryption code.

Each Anom user would be assigned to a particular Jabber Identification ("JID") by the CHS or a high-level distributor upon receipt of a device. A JID is akin to a "PIN" in Blackberry Messenger. The JID is either a fixed, unique alphanumeric identification or (for more recent devices) two English words strung together (such as "duringlaw" or "howthy"). Anom users would be able select their own screen names. Following the initiation of data collection, the FBI maintained a list of a JIDs and corresponding screen names of users and IMEIs of their devices.

In the summer of 2019, the FBI engaged with a European Union member country (hereinafter referred to as the "third county") about whether it was logistically and legally able to assist the FBI with obtaining an iBot server to collect the contents of communications occurring between Anom users. The third country agreed to obtain a court order in accordance with its own legal framework to copy an iBot server located there and provide a copy to the FBI pursuant to a Mutual Legal Assistance Treaty ("MLAT").   In October 2019, the third country obtained a court order which enabled the copying of the iBot server and the receipt of its contents every two to three days. The initial MLAT

between the U.S. and the third country authorized FBI to receive data from October 7, 2019, through January 7, 2020. Due to technological issues with decryption and putting the content into a usable format, the FBI did not begin receiving the actual server content from the third country until October 21, 2019. By this time, there were several hundred users of Anom, with the majority still located in Australia. After October 2019, the third country obtained additional court orders pursuant to its own laws to copy the iBot server and the United States obtained the server data pursuant to additional MLATs. The third country provided Anom server data to the FBI every Monday, Wednesday, and Friday, and continued to do so until the expiration of the third country's court order on June 7, 2021. This data comprised the encrypted messages of all of the users of Anom with a few exceptions (e.g., the messages of approximately 21 Anom users in the U.S. sent to any other Anom device was not reviewed by FBI). The FBI did not install, maintain, or control the server in the third country. The third country, pursuant to its own laws and legal framework, controlled how the Anom data was collected from the server, the frequency of the collection, and how the United States was to obtain the data.

From October 2019 through June 7, 2021, the FBI reviewed and catalogued more than 27 million messages from over 12,000 devices located in over 100 countries. The Trojan Shield investigation uncovered that Anom devices were used exclusively by TCOs to traffic drugs, launder the proceeds of those drug sales, and commit acts of violence and other crimes. Additionally, the review of Anom messages initiated numerous high-level public corruption cases in several countries. The FBI identified over 300 distinct TCOs using Anom, including Italian organized crime, Outlaw Motorcycle Gangs, and various international source, transportation, and distribution cartels in South America and Europe.

### C.   Relevant Procedural Background in This Case

On May 28, 2021, a grand jury sitting in the Southern District of California returned an Indictment against 17 defendants, including Hosseini, Ayub, Dmitrienko, Kumar, and Elhassen, for knowingly participating in a Racketeering Conspiracy that distributed thousands of encrypted communication devices to transnational criminal organizations

*21-CR-1623-JLS*

worldwide to conduct drug trafficking, money laundering, and obstruction of justice. Dkt. 1. On June 7, 2021, the Trojan Shield investigation culminated with more than 500 arrests that took place during a worldwide two-day takedown. During the takedown, foreign authorities deployed more than 9,000 law enforcement officers, searched more than 700 locations, and seized multi-ton quantities of illicit drugs. Overall, the investigation was responsible for more than 1,000 arrests, the seizure of 36 tons of illicit drugs, 50 labs, 240 firearms, and $58 million, and the prevention of 150 homicides.

On December 16, 2022, a grand jury sitting in this District returned a Superseding Indictment against Defendants and their 12 other co-defendants for their participation in the Anom Racketeering Conspiracy. Dkt. 68.

As to discovery, the United States has already provided Defendants with voluminous materials—Anom messages and data (including photos, video, and audio files), reports, and other materials relating to each of the Defendants here. For instance, the United States has produced: to Hosseini, a total of 61,839 files (74.4 GB); to Dmitrienko, a total of 27,595 files (27.4 GB); to Ayub, a total of 8,933 files (17 GB); to Kumar, a total of 29,349 files (30.17 GB); and to Elhassen, a total of 2,087 files (5 GB).

At the May 19, 2023 status hearing, Dkt. 129, counsel for Dmitrienko, Ayub, and Kumar indicated that they would make certain discovery requests relating to the third country and the MLAT between that country and the United States.[5] A few weeks after that, on June 23, 2023, new co-counsel for Kumar sent government counsel an email with several discovery requests. Dkt. 161 (Defs. Mot. To Compel Discovery) App. 68-69. That is the only discovery correspondence the government has received, aside from Defendants' motions here.

---

[5] The Court set a motion hearing for August 1, 2023, with all briefs due by July 11, 2023. Dkt. 129. Elhassen had just been extradited and made his initial appearance the day before, Dkt. 123, and his motion hearing was also set for August 1, *see* Dkt. 129. Hosseini was extradited and appeared days later. Dkt. 133. At the June 9, 2023 hearing on the government's appeal of the magistrate judge's bond conditions, Hosseini's motion hearing was continued to the same date, August 1. Dkt. 154.

*21-CR-1623-JLS*

On July 5, the parties met and conferred in person. Present at that meeting were government counsel and counsel for Hosseini and Kumar, who represented that they were also meeting and making requests on Dmitrienko's behalf. The parties discussed those requests, along with Hosseini's request to inspect an Anom device, and the government declined to provide the broad swaths of information Hosseini, Dmitrienko, and Kumar requested. The government also declined to identify the third country, for reasons discussed in further detail herein. But the government noted that it would provide or consider providing substantial materials, including: (1) redacted copies of the MLAT requests to the third country; (2) redacted copies of the warrants obtained in the third country, which authorized collection of Anom messages on the server in that country; (3) messages of Anom users within the syndicates with which these defendants were in contact; and (4) the opportunity to inspect an Anom device, although the platform is no longer active, of course, and the device does not support a forensic examination or extraction. After that, counsel for Hosseini, Dmitrienko, and Kumar requested a continuance of the motion hearing to allow time to file their motions. The hearing for all five Defendants was reset to August 23, 2023. Dkt. 158, 159.

On July 18, 2023, Elhassen filed his discovery motion. Dkt. 157 ("Elhassen Mot."). Those requests are addressed in Section III.B.5 below. On July 20, Kumar, with Hosseini and Dmitrienko, moved for several categories of information relating to the third country and collection of Anom messages. Dkt. 161 ("Defs. Mot."; joined by Ayub; *see* Dkt. 164). Those requests are addressed in Section III.B.1 below. The same day, Kumar filed another motion for discovery, asking for identities, data, and other information regarding end-users to whom Kumar distributed Anom devices. Dkt. 162 ("Kumar Mot."; joined by Hosseini, Dmitrienko, and Ayub; *see* Dkt. 164, 166, 167). The government responds to that motion in Section III.B.2. Hosseini filed a separate motion to inspect an Anom device, inspect "the Anom network," obtain a copy of all server data, and obtain all technical manuals. Dkt. 163 ("Hosseini Mot."; joined by Dmitrienko, Ayub, and Kumar). Those requests are dealt with in Section III.B.3. Finally, Ayub filed a motion seeking the return of two luxury

*21-CR-1623-JLS*

1  watches, which were seized from his residence in the Netherlands and listed in a Bill of

2  Particulars as subject to forfeiture (Dkt. 141). Dkt. 164 ("Ayub Mot."). Ayub's claims are

3  addressed in Section III.B.4 herein.

4      The government is willing to provide the additional discovery specified below, as

5  discussed during the parties' July 5 meeting. Otherwise, the United States opposes

6  Defendants' remaining requests. They should be denied.

7  **III.**   **ARGUMENT**

8      **A.**   **Legal Framework for Discovery**

9      Under *Brady* and Rule 16, the government "has an obligation to turn over only

10  material, exculpatory or otherwise helpful to the defense, that it has in its possession."

11  *United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019). *Brady* requires production of

12  "evidence favorable to an accused upon request…where the evidence is material to guilt

13  or to punishment[.]" *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Rule 16 requires

14  production of materials "within the government's possession, custody, or control" that are

15  "material to preparing the defense[.]" Fed. R. Crim. P. 16(a)(1)(E)(i); *Cano*, 934 F.3d at

16  1022.

17      "There is no general constitutional right to discovery in a criminal case, and *Brady*

18  did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). To compel discovery

19  under Rule 16, a defendant must make a *prima facie* showing of materiality. *United States*

20  *v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990). "Neither a general description of the

21  information sought nor conclusory allegations of materiality suffice; a defendant must

22  present facts which would tend to show that the Government is in possession of information

23  helpful to the defense." *United States v. Lucas*, 841 F.3d 796, 804 (9th Cir. 2016) (quoting

24  *Mandel*, 914 F.2d at 1219). "[E]vidence is material only if there is a reasonable probability

25  that, had the evidence been disclosed to the defense, the result of the proceeding would

26  have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Cano*, 934 F.3d

27  at 1022.

28

8

While materiality may be a low threshold, *see, e.g., United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013), a defendant must still satisfy the materiality element before obtaining discovery. *See Lucas*, 841 F.3d at 804-08 (and "mere speculation about materials in the government's files" does not require disclosure (citation omitted)). That evidence could be "possibly useful to the defense" does not necessarily mean it is material. *Giglio v. United States*, 405 U.S. 150, 154 (1972). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S.at 682; *Cano*, 934 F.3d at 1022; *see United States v. Antonakeas*, 255 F.3d 714, 725 (9th Cir. 2001). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *Bailey v. Rae*, 339 F.3d 1107, 1115 (9th Cir. 2003) (quoting *Bagley*, 473 U.S. at 682). The issue is not "whether the defendant would more likely than not [receive] a different verdict with the evidence, but whether in its absence he [will receive] a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Further, the Supreme Court has "never held that the Constitution demands an open file policy." *Id.* "*Brady* does not require a prosecutor to turn over files reflecting leads and ongoing investigations where no exonerating or impeaching evidence has turned up." *Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000). The court must "consider the government interests asserted in light of the materiality shown." *Mandel*, 914 F.2d at 1219. Rule 16 does not allow "fishing expedition[s]." *United States v. Chon*, 210 F.3d 990, 994 (9th Cir. 2000); *United States v. Wolfenbarger*, No. 16-CR-0519-LHK, 2019 WL 3037590, at *8 (N.D. Cal. July 11, 2019) (quoting *United States v. Anderson*, 481 F.2d 685, 694 (4th Cir. 1973)). And "*Brady* does not permit a defendant to sift through information held by the government to determine materiality." *Lucas*, 841 F.3d at 807.

Finally, even when a defendant may be entitled to disclosure under Rule 16, information may be withheld under a law-enforcement privilege. As to confidential sources of information, the government has a privilege to withhold the source's identity, limited to

the extent that disclosure or contents of a communication would be "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause[.]" *Roviaro v. United States*, 353 U.S. 53, 60 (1957); *see United States v. Williams*, 898 F.2d 1400, 1402 (9th Cir. 1990). Courts have also recognized a qualified law-enforcement privilege "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witnesses and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation of City of NY v. Myerson*, 856 F.2d 481, 484 (2d Cir. 1988); *see Roviaro*, 353 U.S. at 59, 62; *United States v. Pirosko*, 787 F.3d 358, 365-66 (6th Cir. 2015).

### B.   Responses to Defendants' Discovery Motions

Defendants' requests lack legal support and seek immaterial information. Their multiple, broad requests are addressed individually below and should be denied.

In summary: (1) the information Defendants request about the third country is immaterial. The Fourth Amendment does not apply to the collection of Defendants' Anom messages, no law enforcement conduct here shocks the conscience, and in any event, Defendants already have sufficient information to make a motion to suppress if they wish to do so. As to (2) end-users and additional Anom messages, Defendants already have all of their own Anom messages and, as a result, identifying information about their devices and the other users they conspired with. In any event, the government is willing to provide additional Anom messages—of end-users and syndicates Defendants were in contact with—and has provided all FBI reports about Defendants and their activities (and will continue to provide any additional reports that may come into its possession and as the case proceeds). (3) Defendants' requests to inspect the Anom network and other materials are misplaced. They have not shown materiality, and the issues they raise are matters of authenticity and admissibility of evidence, which the United States will establish at trial. Otherwise, the government will make an Anom device available for inspection (to the extent it can be inspected), and technical documents detailing the Anom platform and

collection process have already been produced. (4) Ayub's motion to compel the return of his watches demonstrates a misunderstanding of criminal forfeiture. Those are assets subject to forfeiture in this case, which Ayub can contest only after his case concludes. Finally, (5) as to Elhassen's requests: there are no specific discovery issues with Elhassen at this point, and the government is aware of and will continue to comply with its discovery obligations.

### 1.    Information About the Third Country

#### a.    Defendants' Requests and the Government's Disclosure

Defendants' motion for third-country information seeks information that is ultimately immaterial. The United States already has provided detailed technical documents, public search warrant materials, each defendant's Anom messages and data, and other information. It also will provide materials relating to its MLAT requests and the third country's authorization to collect Anom messages. Defendants already have sufficient information (and will have only more information) to prepare a motion to suppress, should they wish to do so. The Court should not require more.

Defendants seek five categories of information here: (a) the identity of the third country; (b) the location of the iBot server within the third country; (c) the agency(ies) of the third country with which U.S. law enforcement worked; (d) all communications between authorities of the third country and United States; and (e) the final and any draft agreements between the U.S. government and the third country relating to Anom. Defs. Mot. at 8-9, 18. They say they need this information "so they can assess the legality of the Anom program under the laws of that country" to potentially draft "an anticipated, and potentially dispositive motion to suppress the evidence obtained from the foreign server." *Id.* at 14. Defendants further state that the information will assist them in drafting a motion to suppress by "shed[ding] additional light on why the U.S. government chose this particular country to host the server, and the nature of the joint venture." *Id.* at 17. In short, it appears that Defendants request this information so that they can try to show that the United States engaged in a joint venture with the third country to conduct searches that

11

1    were unreasonable under that country's law and produced data that is subject to

2    suppression.

3        Taking the last category first, any final and draft agreements—there was no such

4    "agreement" between the United States and the third country, as the government already

5    advised defense counsel during the July 5 meet-and-confer. The United States made a

6    request pursuant to the MLAT with the third country; in response, the third country

7    obtained warrants authorizing the collection of Anom messages on a server within that

8    country, and it then provided the United States with Anom data collected pursuant to the

9    warrants and MLAT. *See above*, Section II.B.

10       The government will provide Defendants with redacted copies of the United States'

11   requests to the third country pursuant to the MLAT. These materials will set forth the

12   substance of those requests and MLAT procedure relating to the third country's collection

13   of Anom messages and provision to the United States. The government will also produce

14   redacted, English-version (translated) copies of the third country's search warrants. The

15   warrants will show the third country's authorization to lawfully collect the messages and

16   provide information about the procedure for their collection.

17       Defendants' remaining requests, (a) through (d) above, should be denied. They

18   cannot prevail on a motion to suppress, and so the information they seek in those remaining

19   requests is immaterial.

20

21           **b.    The Information Defendants Seek Is Immaterial Because the
                     Fourth Amendment Does Not Apply and Law
22                   Enforcement's Investigation Does Not Shock the Conscience**

23       Defendants have failed to justify their need for third-country discovery. They

24   apparently are trying to bolster their potential arguments for suppression. But their

25   arguments also try to circumvent a critical component of Fourth Amendment law and the

26   joint-venture analysis—whether Defendants are among the class of persons to which the

27   Fourth Amendment applies. The answer to that question is clear: they are not. They lack

28   standing to challenge the collection of their Anom messages under the Fourth Amendment.

As a result, the only ground on which defendants could raise a constitutional challenge to the admissibility of the Anom evidence is that the actions of the foreign officials who collected it "shocks the judicial conscience." But nothing about the collection of Anom messages and evidence in this case is so extreme that it shocks the conscience. As a result, Defendants cannot prevail on a such a suppression motion and cannot justify their myriad requests for discovery.

(i)   <u>Legal Framework</u>

As a matter of law, Defendants would not prevail on a motion to suppress Anom messages—messages collected by law enforcement in the third country and provided to the United States via the MLAT. This is because the Fourth Amendment does not apply to searches and seizures conducted by foreign law enforcement against foreign nationals. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990); *United States v. Mohamud*, 843 F.3d 420, 439 (9th Cir. 2016); *United States v. Getto*, 729 F.3d 221, 227 (2d Cir. 2013); *United States v. Zakharov*, 468 F.3d 1171, 1179 (9th Cir. 2006); *United States v. Barona*, 56 F.3d 1087, 1091 (9th Cir. 1995); *United States v. LaChapelle*, 869 F.2d 488, 489 (9th Cir. 1989). The Fourth Amendment protects "the People of the United States," which "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Verdugo-Urquidez*, 494 U.S. at 265. That class of persons includes "American citizens at home and abroad and lawful resident aliens within the borders of the United States who are victims of actions taken in the United States by American officials." *Barona*, 56 F.3d at 1094 (quotation marks omitted) (quoting *United States v. Verdugo-Urquidez*, 856 F.2d 1214, 1234 (9th Cir. 1988) (Wallace, J., dissenting), *rev'd*, *Verdugo-Urquidez*, 494 U.S. 259). It also may apply to aliens who have "assumed the complete range of obligations that we impose on the citizenry" such that they can "be considered one of the people of the United States entitled to the full panoply of rights guaranteed by our Constitution." *Id.* (quoting *Verdugo–Urquidez*, 856 F.2d at 1234 (Wallace, J., dissenting)). But it does not apply to "aliens with no voluntary connection to the United States." *Barona*,

13

56 F.3d at 1093 (citing *Verdugo-Urquidez*, 494 U.S. at  274-75). Without a "voluntary attachment to the United States," a foreign defendant is not within that class of persons. 494 U.S. at 274-75; *see also Barona*, 56 F.3d at 1093-94 ("Not until an alien has assumed the complete range of obligations that we impose on the citizenry may he be considered one of 'the people of the United States' entitled to the full panoply of rights guaranteed by our Constitution." (citation omitted)).

Courts across the country have found that defendants situated like Defendants in this case—foreign nationals without voluntary connections to the United States—are not entitled to Fourth Amendment protections. *See, e.g.*, *Verdugo–Urquidez*, 494 U.S. at 274-75 (defendant "was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched was located in Mexico"); *United States v. Emmanuel*, 565 F.3d 1324, 1331 (11th Cir. 2009) (as a "citizen and resident of the Bahamas with no significant voluntary attachment to the United States," defendant was "entirely outside of that community" protected by the Fourth Amendment); *United States v. Alahmedalabdaloklah*, No. CR-12-01263-PHX-NVW, 2017 WL 2839645, at *3 (D. Ariz. July 3, 2017) (defendant was a "nonresident alien who had no previous significant voluntary connection with the United States" and "was located and resided outside the United States"); *United States v. Knowles*, No. CR 12-266 (RWR), 2015 WL 10890271, at *4 (D.D.C. Dec. 30, 2015) (defendants were "neither citizens nor residents of the United States…and neither ha[d] shown any qualifying voluntary connection to the United States"); *United States v. Gomez Castrillon*, No. S2 05 CR. 156 (CM), 2007 WL 2398810, at *3 (S.D.N.Y. Aug. 15, 2007) (defendants were "citizen[s] of Colombia" who were "residing in Colombia with no voluntary attachment to the United States []other than their participation in various schemes to send controlled substances here"). Courts have even denied Fourth Amendment protection where defendants can claim some contacts with the United States. In *United States v. Baboolal*, the defendant regularly visited the United States, had family and friends who live in the United States, had business contacts in the United States, and had taken a family vacation to the United States. No. 05-CR-215, 2006

WL 1674480 (E.D. Wisc. June 16, 2006), *report and recommendation adopted*, No. 05-CR-215, 2006 WL 1942357 (E.D. Wis. July 11, 2006). Nonetheless, the court refused to find a "substantial connection" to the United States based on "the rather minimal and transitory connections the defendant outlined." *Id.*, at *3. In *United States v. Mohammad*, the defendant had previously studied at a university in the United States for approximately five years, and, following the return to his home country, had visited the United States on two occasions, including one trip to marry his wife (a United States citizen). 339 F. Supp. 3d 724 (N.D. Ohio 2018). The court noted that while the defendant may have had sufficient voluntary connection to the United States while he lived here, that connection "weakened over the years" and did not suffice to bestow on him the Fourth Amendment's protections. *Id.* at 748.

There are just two "very limited exceptions" to the rule that the Fourth Amendment does not apply to foreign searches and seizures: (1) if the circumstances of the foreign search and seizure are "so extreme that they shock the judicial conscience"; and (2) if United States' agents' participation in the investigation is "so substantial that the action is a joint venture between the United States and foreign officials," *Barona*, 56 F.3d at 1092-93 (cleaned up); *see also Getto*, 729 F.3d at 228 (applying "longstanding principles of 'virtual agency' and intentional constitutional evasion" rather than adopting "joint venture doctrine"). The "shock-the-conscience" exception requires extraordinary circumstances. It is based on "the recognition that [courts] may employ [their] supervisory powers when absolutely necessary to preserve the integrity of the criminal justice system," rather than the Fourth Amendment. *Barona*, 56 F.3d at 1091; *accord Getto*, 729 F.3d at 229. "Simply illegal" conduct is insufficient—"it must be egregious." *Getto*, 729 F.3d at 228 (citation omitted). This exception "is meant to protect against conduct that violates fundamental international norms of decency." *Emmanuel*, 565 F.3d at 1331 (citing *United States v. Mitro*, 880 F.2d 1480, 1483 (1st Cir. 1989)) *see also United States v. Rose*, 570 F.2d 1358, 1362 (9th Cir. 1981) ("[t]here [was] no evidence that United States agents were attempting to undermine the Fourth Amendment rights of a citizen by circuitous and indirect methods"

(citation omitted)); *Knowles*, 2015 WL 10890271, at *3 (noting that foreign court-authorized wiretaps "do not come close to requiring the invocation of this exception," and even if the interceptions were not lawfully authorized, "wiretapping does not shock the conscience simply because it was unauthorized" (citing *Barona*, 56 F.3d at 1091 (cleaned up)).[6]

For defendants to have any claim to suppression based on the joint-venture doctrine,[7] they "first must show that they are among the class of persons that the Fourth Amendment was meant to protect." *Barona*, 56 F.3d at 1093. Courts assess whether defendants are

---

[6] The concept's origins are instructive. It arose from a Supreme Court case involving police's unlawful entry into the defendant's bedroom, attempt to forcibly extract drugs from his mouth and throat, and then forcing him to undergo a stomach pump and vomit the drugs. *Rochin v. California*, 342 U.S. 165, 166, 172 (1952). The Court concluded that this conduct was "too close to the rack and the screw to permit of constitutional differentiation." *Id.*; *see also, e.g.*, *United States v. Minaya*, No. CV 17-359 (KM), 2019 WL 1615549, at *7 (D.N.J. Apr. 16, 2019) ("Such conduct must involve, not mere illegality, but conduct that is 'egregious,' such as 'torture [or] terror,' or brutal interrogation tactics." (quoting *Getto*, 729 F.3d at 228)), *aff'd*, 827 F. App'x 232 (3d Cir. 2020) (not precedential). *Knowles*, 2015 WL 10890271, at *4 (discussing the shock-the-conscience standard and *Rochin*).

[7] The United States intends to the address the joint-venture doctrine—and its non-application here—in further detail in response to any defense motion to suppress and to the extent the Court considers it in this case. In summary, courts have required substantial involvement and direction by U.S. authorities to conclude a joint venture existed. *E.g.*, *Barona*, 56 F.3d at 1094; *Peterson*, 812 F.2d at 490. American agents' participation, sharing information, and requesting assistance through an MLAT is insufficient. *E.g.*, *United States v. Valdivia*, 680 F.3d 33, 52 (1st Cir. 2012); *LaChapelle*, 869 F.2d at 490; *Getto*, 729 F.3d at 230; *United States v. McVicker*, 979 F. Supp 2d 1154, 1183 (D. Or. 2013). Even if a court concludes there was a joint venture, then the typical reasonableness standard applies—whether the search was reasonable under applicable foreign law. *E.g.*, *Barona*, 56 F.3d at 1094. And even if the foreign search or seizure did not comply with the foreign country's law, then the good faith exception prevents suppression when "law enforcement officers acted on a reasonable belief that their conduct was legal." *Barona*, 56 F.3d at 1092-93 & n.1; *Peterson*, 812 F.2d at 490; *United States v. Boyajian*, No. 16-50327, 2023 WL 3915966, at *2 (9th Cir. June 9, 2023) (unpublished).

The exclusionary rule generally does not apply to foreign searches because it would not serve the purpose of deterrence for which it was designed. It is a judicially-created rule focused on the conduct of U.S.—not foreign—law enforcement. *Peterson*, 812 F.2d at 492; *Getto*, 729 F.3d at 227 n.7, 231; *Valdivia*, 680 F.3d at 51; *Boyajian*, 2023 WL 3915966, at *2.

*21-CR-1623-JLS*

entitled to Fourth Amendment protections before considering suppression arguments based on the joint-venture doctrine. *See id.*; *Emmanuel*, 565 F.3d at 1331; *United States v. Bourdet*, 477 F. Supp. 2d 164, 176-77 (D.D.C. 2007); *United States v. Magi*, No. CR 07-01402 SJO-4, 2017 WL 11341133, at *4 (C.D. Cal. Dec. 4, 2017). If defendants are not among that class, then Fourth Amendment principles do not apply. *Emmanuel*, 565 F.3d at 1331; *United States v. Larrahondo*, 885 F. Supp. 2d 209, 220-21 (D.D.C. 2012) (denying defendant's motion to suppress evidence obtained from Colombian wiretap on joint-venture grounds because "the Fourth Amendment does not apply under present circumstances and [defendant] has not alleged facts indicating conduct by foreign officials that shocks the conscience"); *Bourdet*, 477 F. Supp. 2d at 176-77 (defendants, Guatemalan nationals, "were not protected by the Fourth Amendment at the time of their arrests" in El Salvador); *Magi*, 2017 WL 11341133, at *4  ("Magi, who continues to assert that he is a resident of Canada, lives in Canada and is a Canadian citizen…has not shown that he is 'among the class of persons that the Fourth Amendment was meant to protect.'" (cleaned up) (citing *Barona*, 56 F.3d at 1093)); *Gomez Castrillon*, 2007 WL 2398810, at *3 ("Just as in *Verdugo-Urquidez*, the Fourth Amendment simply has no application these facts": Colombian defendants who were residing in Colombia without any voluntary connection to the United States "other than their participation in various schemes to send controlled substances here").

This limits discovery, too. Additional information about the collection of evidence by foreign authorities, or collaboration between U.S. and foreign law enforcement, is immaterial where a foreign national without the requisite connections to the U.S. challenges the collection of evidence against him in a foreign country, and so defendants in that position are not entitled to additional discovery based on an alleged joint venture. *Larrahondo*, 885 F. Supp. 2d at 221 (denying defendant's discovery requests regarding alleged joint venture and stating, "[t]he Court does not believe that further factual development in the present situation is warranted in the present situation. *Verdugo* forecloses the claim under the Fourth Amendment.").

(ii)     <u>Defendants Have No Legal Authority for Their Position</u>

Defendants have neither demonstrated the materiality of their discovery requests nor made compelling comparisons to legal precedent. Without Fourth Amendment protections, Defendants have no constitutional or other basis to move to suppress the evidence collected by the third country. And absent a basis for suppression, Defendants have not articulated any materiality of the requested discovery to the preparation of potential defenses. Rule 16 requires the presentation of "facts which would tend to show that the Government is in possession of information helpful to the defense." *Lucas*, 841 F.3d at 804. The information Defendants request cannot be helpful to their defenses and does not fall within the scope of Rule 16.

Defendants' attempts to manipulate case law to support their position likewise falls flat. The cases Defendants cite either involve American citizens who can claim the protections of the Fourth Amendment or hold in favor of the United States on the issue at hand. The glaring absence of favorable legal precedent highlights the frailty of Defendants' position. Their motion should be denied.

### *Defendants Have No Basis in Discovery Rules To Compel Production of the Discovery They Seek*

All Defendants here are outside of the class of persons the Fourth Amendment protects. Each of the Defendants in this case is a citizen of a country other than the United States. None of the Defendants has resided in the United States or ever had lawful permanent resident status in the United States. And none of them has any voluntary attachment to the United States that entitles them to Fourth Amendment rights. The Fourth Amendment does not apply to Defendants and the evidence gathered against them in the third country, and they cannot avail themselves of the joint-venture doctrine. *E.g.*, *Verdugo-Urquidez*, 494 U.S. at 265, 274-75; *Barona*, 56 F.3d at 1093-94; *Emmanuel*, 565 F.3d at 1331; *Larrahondo*, 885 F. Supp. 2d at 221; *Alahmedalabdaloklah*, 2017 WL 2839645, at *3.

18

Defendants would not be able to prevail on a suppression motion asserting a joint venture between the United States and the third country, and so there is no Fourth Amendment defense relating to the third country available to them.[8] Further, the collection of Anom messages in the third country does not shock the conscience. "Defendants forget how very limited [a court's] inquiry into a foreign search may be[,]" *Mitro*, 880 F.2d at 1483; the standard for this exception is very high—requiring not only illegal but egregious conduct that the Court would sanction only if "absolutely necessary to preserve the

---

[8] The Rule 16-related cases Defendants rely on do not require the discovery they request. For instance, Defendants cite *Hernandez-Meza*, 720 F.3d at 768, for the propositions that they "need not spell out [their] theory of the case in order to obtain discovery," and the government is not "entitled to know in advance what specifically the defense is going to be." Defs. Mot. at 10. But Defendants' obligation to show materiality remains, and the facts of *Hernandez-Meza* are plainly distinct from the facts here. The issue there was whether, in an illegal-reentry case where the defendant contested alienage, the defendant's mother's naturalization certificate should have been disclosed. The Ninth Circuit concluded the certificate should have been provided, noting that "one of the elements of illegal reentry is alienage," and the government did not "need much imagination to realize that Hernandez-Meza might try to cast doubt on the government's proof of his alienage" and "must have understood that derivative citizenship was a possible line of defense[.]" 720 F.3d at 768. There is no comparable defense in this case relating to the third country, including because the Fourth Amendment does not apply to Defendants and the evidence collected in the third country.

Defendants' reliance on *United States v. Soto-Zuniga*, 837 F.3d 992, 1000-01 (9th Cir. 2016) is also unavailing. They cite that case to say that information "'material to preparing the defense[]' is not limited to responding to the government's case-in-chief." Defs. Mot. at 10. The defendant in that case argued that a Border Patrol checkpoint was unconstitutional and requested discovery of arrest and search statistics. The Ninth Circuit required disclosure of such information, noting that at issue was whether the "primary purpose" of the checkpoint was "controlling immigration" or "detecting ordinary wrongdoing," and stating that "Rule 16(a)(1)(E) permits discovery related to the constitutionality of search or seizure." 837 F.3d at 1001, 1002 (citations omitted). Even aside from the very different facts of that case, Defendants here already have sufficient information to make a motion to suppress if they wish. And *Soto-Zuniga*'s conclusions about the scope of Rule 16 do not support additional third-country discovery because the Fourth Amendment has no application. Rather, Defendants' requests are part of a "far reaching fishing expedition" regarding the third country and Anom. *Id.* at 1001 (discussing and quoting *Chon*, 210 F.3d at 992, where the Ninth Circuit denied the defendants' requests for discovery about NCIS activities and alleged violations of the Posse Comitatus Act).

integrity of the criminal justice system." *Barona*, 56 F.3d at 1091. Here, the third country lawfully obtained court authorization to collect Anom data, and the data were properly collected and transmitted to the FBI via the MLAT. *See above*, Section II.B; Defs. Mot. App. 9-10. Title III does not apply.[9] The Fourth Amendment does not apply. Accordingly, as described above, there was no "intent to evade the Fourth Amendment's requirements," *Getto*, 729 F.3d at 232 (emphasis omitted); the third country's collection of Anom messages was not done "to avoid the Fourth Amendment's warrant requirement and Title III's rigors." *Cf.* Defs. Mot. at 16-17. Rather, the third country could and did—lawfully—collect Anom data, and the United States could and did—lawfully—receive the data pursuant to the MLAT. And note: all of this concerned hardened encrypted devices that were used specifically for criminal activity (in Hosseini's own words, devices "Built by criminals for criminals"). Nothing about the third country's collection of Anom messages and data from its server, or that country's collaboration with the FBI, was illegal—let alone conscience-shocking.[10]

As a result, the third-country information Defendants seek is necessarily immaterial. *See* Fed. R. Crim. P. 16(a)(1)(E)(i); *see Larrahondo*, 885 F. Supp. 2d at 221; *cf. United States v. Khan*, 35 F.3d 426, 431 (9th Cir. 1994) (in prosecution of crew for possession of hashish aboard a ship subject to U.S. jurisdiction, affirming denial of discovery regarding "negotiations between the United States and St. Vincent on the issue of consent [to apply U.S. law to the ship and the crew, sought through diplomatic channels]" because it was "immaterial to their defense. There is no question that St. Vincent did consent and…the timing of its consent is irrelevant.").The government also does not intend to use such

---

[9] The wiretap act (Title III of the Omnibus Crime Control and Safe Streets Act of 1968, amended by the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510 *et seq.*) does not apply extraterritorially. *United States v. Barona*, 56 F.3d 1087, 1090 (9th Cir. 1995); *United States v. Peterson*, 812 F.2d 486, 492 (9th Cir. 1987). So it does not apply to the collection of Anom messages within the third country, as the government will brief more fully insofar as the defense relies on Title III in a future motion.

[10] The United States will address this issue, too, in more detail as it may be substantively raised in a later defense motion(s) to suppress.

information about the third country in its case-in-chief at trial. *See* Fed. R. Crim. P. 16(a)(1)(E)(ii). Nothing Defendants request would change the outcome of the case or undermine confidence in it. *See Kyles*, 514 U.S. at 434; *Bagley*, 473 U.S. at 682. No such information is exculpatory under *Brady*. And through analogy, disclosure of the identity of and information about the third country would not be relevant or helpful to the defense, or essential to a fair trial, because Defendants will have no means of suppression. *Cf. Roviaro*, 353 U.S. at 60; *Williams*, 898 F.2d at 1402; *United States v. Carlos*, 189 F.3d 475, 1999 WL 511461, at *1 (9th Cir. 1999) (unpublished) ("mere suspicion or speculation that the information might provide relevant and helpful information will not suffice.").

Plainly, Defendants are trying to embark on a fishing expedition about the third country by requesting not only identifying information but server-location information, third-country agency information, and "*all communications*" between the third country and the United States about Anom. Defs. Mot. at 8-9, 18 (emphasis added). Rule 16 does not allow, let alone require, such broad discovery. *See Chon*, 210 F.3d at 994-95 (affirming district court's denial of "far reaching" discovery requests relating to NCIS activities targeting civilians, all OCDETF activities targeting civilians, and other materials allegedly relating to violations of the Posse Comitatus Act); *Wolfenbarger*, 2019 WL 3037590, at *8 (denying "expansive" request for "all communications between a private entity and the FBI and between a private entity and a non-profit entity that pertain to a five-year investigation involving hundreds of private email accounts, CyperTipline reports, search warrants, FBI lead packages, and investigations regarding targets other than the defendant," some investigations of which was ongoing). Moreover, the discovery Defendants request does not "fortify[]" any potential "shield claims" relating to Anom and the third country, *Chon*, 210 F.3d at 995, because the Fourth Amendment simply is not a shield for them.

*Larrahondo* is on point. A defendant in that case moved to suppress evidence obtained from a wiretap by law enforcement in Colombia, asserting there was a joint venture between the DEA and Colombian National Police, and moving for additional discovery—"to determine the precise manner in which the wiretap(s) in this case was

commenced, including whether the information which began the process was provided by U.S. law enforcement agents, the nature of the information, and other relevant details[,]" in addition to "information concerning the status of the CNP officers who conducted the eavesdropping, as well as details concerning the equipment and other materials utilized to conduct the wiretap." *Larrahondo*, Cr. No. 10-018 (JDB), Dkt. 154 at 4-5, 2012 WL 5974550. The court denied those discovery requests. Concluding that the Fourth Amendment did not apply to the Colombian national defendant in that case, the court determined that no "further factual development of this issue is warranted[.]" *Larrahondo*, 885 F. Supp. 2d at 221. In addition, there was no indication the wiretap evidence "shocks the conscience"—defendant "allege[d] only that Colombian law enforcement monitored the telephone lines at issue for a long period of time and captured an enormous number of calls"—and the court had no "additional reason to believe that objectionable facts exist[.]" *Id.* at 221-22. So no further discovery was permitted on that alleged basis for suppression, either. *Id.* The Court should reach the same conclusion in this case. Defendants are not subject to Fourth Amendment protection and have no legal or factual basis to suppress the Anom evidence collected in the third country. As a result, the broad scope of information they seek is immaterial and not otherwise subject to discovery.

### *The Law Enforcement Privilege Also Protects the Information from Disclosure*

Even when a defendant is entitled to disclosure under Rule 16(a)(1)(E)(i), the evidence may be withheld under a law enforcement privilege. In *Roviaro*, the Supreme Court held that the government had a privilege to withhold from disclosure the identities of certain confidential informants. 353 U.S. at 59. Although the Ninth Circuit has not explicitly adopted the law enforcement privilege yet, courts throughout the country have recognized it and used that privilege as a basis to deny discovery requests such as this one. *See Pirosko*, 787 F.3d at 366 (applying the privilege to the government's Shareaza program); *United States v. Van Horn*, 789 F.2d 1492, 1508 (11th Cir. 1986) (surveillance equipment); *United States v. Harley*, 682 F.2d 1018, 1020-21 (D.C. Cir. 1982) (surveillance locations); *United States v. Gonzales*, No. 17-01311, 2019 WL 669813 (D.

Ariz. Feb. 19, 2019) (the government's BitTorrent program). The purpose of the privilege is "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witnesses and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation of City of NY*, 856 F.2d at 484. The government bears the initial burden of showing that the law enforcement privilege applies to the materials at issue, and the Court must then apply a balancing test to weigh the government's concerns against the needs articulated by the defendant. *Pirosko*, 787 F.3d at 365.

The Supreme Court has declined to establish fixed rules for deciding whether the government may withhold material information under a law enforcement privilege, holding instead that trial courts must engage in balancing on a case-by-case basis:

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest and protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders non-disclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Roviaro*, 353 U.S. at 62.

In this case, Defendants have requested discovery that would reveal sensitive law enforcement partnerships, the identities of the foreign officials who assisted the FBI, and the manner in which technology was employed, all which constitute sensitive law enforcement information subject to the qualified privilege recognized in *Roviaro* and *Van Horn.* This Court must balance the government's interest in maintaining the secrecy of its investigative techniques with the defendant's interest in a fair trial, *see Roviaro* and *Van Horn.*

The level disclosure required for a suppression hearing under the Fourth Amendment is less than what is required to be disclosure for trial. The Supreme Court has explained:

> This Court on other occasions has noted that the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself. At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial. Furthermore, although the Due Process Clause has been held to require the Government to disclose the identity of an informant at trial, provided the identity is shown to be relevant and helpful to the defense, *Roviaro*[,]…, 353 U.S. at 60-61, it has never been held to require the disclosure of an informant's identity at a suppression hearing. *McCray v. Illinois,* 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). We conclude that the process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself.

*United States v. Raddatz,* 447 U.S. 667, 679, (1980).

The District of Columbia Circuit Court has similarly recognized the more limited nature of disclosures required for suppression hearings:

> The proceedings have different functions. Suppression hearings determine whether the police engaged in unlawful conduct, and seek to deter such conduct by excluding evidence. Trials decide whether the accused committed the offense charged. Privileges shield witnesses from cross-examination. A defendant's right to cross-examination is more limited at suppression hearings than at trials, which is why hearsay is generally admissible at the former but not the latter.

*United States v. Foster,* 986 F.2d 541, 543 (D.C. Cir.1993).

In this case, Defendants have requested discovery in the hopes of finding something that could result in a suppression motion. Defendants have already received extensive technical documents that detail how the Anom platform functioned, numerous messages they sent or received on the Anom platform, and all the law enforcement reports concerning those messages. Defendants have more than sufficient information to file a suppression motion if they choose.

### *Defendants Cite No Cases Allowing the Discovery They Seek*

The cases Defendants cite in fact align with the fundamental propositions underlying the Fourth Amendment—and those cases involved United States citizens. Notably, none of those cases suggest that non-resident aliens without sufficient voluntary connections to

*21-CR-1623-JLS*

the United States can claim the protections of the Fourth Amendment or are entitled to discovery based on an alleged joint venture.

For example, in *Getto*, which Defendants cite for the proposition that they should be able to compel evidence based on the conscience-shocking conduct theory or U.S. agents' cooperation with foreign law enforcement, *see* Defs. Mot. at 14, 16, the defendant was an American citizen. The Second Circuit still determined that Israeli law enforcement were not "virtual agents" of U.S. authorities, a search of in Israel did not shock the conscience, and suppression of the evidence obtained in Israel was unwarranted. *See Getto*, 729 F.3d at 228-33. Similarly, *United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992), *see* Defs. Mot. at 15, involved a wiretap of a United States citizen by Turkish law enforcement. *See also Gomez Castrillon*, 2007 WL 2398810, at *3 ("Unlike the case at bar, *Maturo* involved a wiretap by a foreign nation of a United States citizen. Thus, the fact that a test is set forth in that case does not undercut the holding in *Verdugo-Urquidez*, that an alien with no attachment to the United States has no Constitutional claim."). Defendants also tout *Peterson* 812 F.2d 486, 490 (9th Cir. 1987), for the proposition that "the law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable." Defs. Mot. at 15. A court may consult the foreign law if it determines a joint venture existed, but importantly, the Ninth Circuit's decision in *Peterson* pre-dated *Verdugo-Urquidez*.

The only other cases Defendants cite in support of their arguments for compelling evidence of a joint venture were decided in the United States' favor, undercutting their arguments even further. For example, Defendants state that *United States v. Lee*, 723 F.3d 134 (2d Cir. 2013), is a case that "endorse[d]" "the exact procedure" they seek to pursue— production of information under the joint-venture doctrine. *See* Defs. Mot. at 12. But in *Lee*, the Second Circuit actually denied the defendant's motion to compel the United States to turn over documents underlying Jamaican foreign wiretap applications. In fact, the defendant in *Lee* made arguments nearly identical to the ones Defendants espouse here, specifically, that "without reviewing the underlying Jamaican affidavits and applications,

25

1  there [was] no way of knowing that the Jamaican wiretaps were properly obtained and

2  permissible under *Maturo*," 723 F.3d at 141 (quotation marks and brackets omitted), and,

3  as a result, the evidence should have been suppressed. The Second Circuit disagreed,

4  holding that the district court "did not err in denying Lee's motion to compel the retrieval

5  and submission of documentation submitted to a Jamaican court in support of the wiretap

6  orders executed against him abroad." *Id.* at 142.

7       Defendants next describe *United States v. Karake*, 281 F. Supp. 2d 302 (D.D.C.

8  2003), as "even more on point." Defs. Mot. at 12. Specifically, the defendants in *Karake*

9  sought information regarding statements they made to Rwandan law enforcement agents,

10 claiming that Rwanda was acting as an agent of the United States. *See Karake*, 281 F. Supp.

11 2d at 308. Importantly, however, the information sought in *Karake* related to an

12 interrogation rather than a search, meaning that the case implicated the Fifth Amendment

13 rather than the Fourth Amendment. That distinction is critical. As the Supreme Court

14 indicated in *Verdugo–Urquidez*, "the Fourth Amendment applies to a smaller group of

15 individuals than the Fifth Amendment, in accordance with the Fourth Amendment's more

16 restrictive text." *Larrahondo*, 885 F. Supp. 2d at 221 (citing *Verdugo-Urquidez*, 494 U.S.

17 at 264-65); *see also Lee*, 723 F.3d at 139 ("the purpose of the Fourth Amendment's

18 exclusionary rule is to inculcate a respect for the Constitution in the police of our own

19 nation" (quotation marks omitted)). More specifically, "[u]nlike the Due Process Clause of

20 the Fifth Amendment, which protects all 'persons,' the Fourth Amendment protects only

21 'the People of the United States.'" *Barona*, 56 F.3d at 1093; *see also Alahmedalabdaloklah*,

22 2017 WL 2839645, at *2 ("The Court explained that, unlike amendments that protect a

23 'person' or an 'accused,' the Fourth Amendment protects only 'the people,' a term of

24 art…that refers to a class of persons who are part of a national community or who have

25 otherwise developed sufficient connection with this country to be considered part of that

26 community." (citing *Verdugo-Urquidez*, 494 U.S. at 265)). This important difference

27 between the scopes of the Fourth and Fifth Amendments explains why the district court's

28 basis for compelling the production of evidence in *Karake* does not extend to Defendants'

requests here. Despite Defendants' arguments to the contrary, *Karake* does not apply to cases like this where the evidence sought relates to a search, as opposed to an interrogation, conducted on foreign soil.[11]

In summary, Defendants have not cited—and could not cite—any authority in support of their theory that they are among the individuals who the Fourth Amendment is designed to protect and that they are entitled to the discovery they seek. Defendants also have not cited any cases indicating that the joint-venture doctrine should be applied where defendants are not otherwise entitled to the protections of the Fourth Amendment. Without the protections of the Fourth Amendment or access to the joint-venture doctrine, Defendants could not prevail on a motion to suppress under the Fourth Amendment, and as discussed, there is no reason to believe that law enforcement's activities here would shock the conscience. And without any legal basis to file a motion to suppress, defendants cannot make a *prima facie* showing of materiality, or that they have presented "facts which would tend to show that the Government is in possession of information helpful to the defense." *Mandel*, 914 F.2d at 1219.

Absent a proper *prima facie* showing of materiality, the Court should deny Defendants' motion.

###        c.        Third-Country Information Is Not Material to Further Investigation or a Suppression Motion on Other Grounds

The materials Defendants request are not subject to discovery for the additional reason that the investigation they propose would not be material to any defense, to the

---

[11] The *Karake* decision is also distinguishable because of the nature of charges at issue in that case.  In *Karake*, the defendants were brought to the United States to face charges that carried the potential for the death penalty. *Karake*, 281 F. Supp. 2d at 305. The *Karake* court referred to this unique posture in a number of places throughout the opinion, and specifically observed that "resolution of these discovery issues is far more challenging than the typical criminal case, since the defendants face potential death sentences if convicted." *Id.* at 305. Unlike in *Karake*, Defendants here do not face the death penalty upon conviction. In fact, the maximum sentence that Defendants face is 20 years' custody.

extent such investigation would be available to them. Defendants propose issuing of letters rogatory, engaging investigators in the third country, and possibly conducting foreign depositions. *See* Defs. Mot. at 11-13. They claim the requested information would enable them to "hire legal counsel in the third-party country to help assess the legality of the Anom surveillance program under the laws of that country." Defs. Mot. at 14. Defendants' proposed investigative tactics are speculative, at best, and in any event, related third-country information would not be material.

First, as discussed above, the Fourth Amendment does not apply here. So Defendants would not be able to suppress Anom evidence on the basis of a joint venture or on the ground that law enforcement's conduct shocked the conscience. Investigation relating to the third country, including issuing letters rogatory and attempting to interview individuals from the third county regarding the Anom data, is immaterial for the same reasons discussed above.

Second, Defendants have no hook for this discovery in the MLAT itself. To first principles: treaties and their provisions are matters between sovereign states, and a treaty is "primarily a compact between independent nations." *Head Money Cases*, 112 U.S. 580, 598 (1884); *see Medellin v. Texas*, 552 U.S. 491, 505 (2008). There is a presumption that "international agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." *Medellin*, 552 U.S. at 506 n.3 (cleaned up). And the MLAT here makes that explicit. The MLAT between the United States and third country provides that, among other things, it is intended solely for mutual legal assistance between the parties, and its provisions shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence. This language means what it says. Defendants have no right to obtain or suppress evidence pursuant to the MLAT. *In re Request from United Kingdom Pursuant to Treaty Between Gov't of U.S. & Gov't of United Kingdom on Mut. Assistance in Crim. Matters in the Matter of Dolours Price*, 685 F.3d 1, 11-12 (1st Cir. 2012) (analyzing same provision in an analogous U.S.-U.K. MLAT, and citing cases); *In re Grand Jury Subpoena*, 646 F.3d

159, 165 (4th Cir. 2011) (analyzing same provision in treaty between "the United States and Company 1's home country"); *In re Chitron Elecs. Co.*, 668 F. Supp. 2d 298, 306-07 (D. Mass. 2009) (analyzing same provision in U.S.-China MLAT).

This applies to letters rogatory, too, which are a matter of the court's discretion. *United States v. Staples*, 256 F.2d 290, 292 (9th Cir. 1958). Indeed, "[a] contrary finding could potentially open U.S. foreign affairs to the far-flung theories of criminal defendants and risk delay of trial as other countries respond to those requests." *United States v. McLellan*, 959 F.3d 442, 473-74 (4th Cir. 2020); *see also id.* at 476 ("the district court does not have the authority to compel the government to issue MLAT requests").

Third, the cases Defendants rely on lend them no support. *Lee*, *Karake*, and other decisions they cite are discussed above and only undermine their claims.

For all of these reasons, Defendants' requests for additional information regarding the third country should be denied.

## 2.     Requests for Information About Distribution of Devices

Materials already in discovery address much of Defendants' requests regarding end-users and identifying information. And the government is willing to provide additional Anom messages: messages of end-users and syndicates[12] with whom Defendants were in contact. This voluminous discovery more than satisfies the government's discovery obligations, and Defendants' requests should otherwise be denied.

Specifically, Defendants request: (a) identifying information and documents regarding all Anom devices they distributed or serviced; (b) identities of end-users who used devices they distributed or serviced; (c) identities of anyone else who distributed a device they serviced and who serviced a device they distributed; (d) all data from Anom

---

[12] As the FBI reviewed Anom messages, JIDs (Anom users) were grouped into syndicates based on other JIDs with which they frequently communicated. Anom users often communicated with multiple syndicates but could be placed in only one syndicate within the review platform, and so JIDs were placed into the syndicate with which they had the greatest frequency of communications. In short, these syndicates reflect criminal organizations of Anom users.

devices Defendants used themselves or distributed or serviced; and (e) all reports relating to any drug transaction, attempted transaction, or seizure involving Defendants or other users who used Anom devices that Defendants distributed or serviced. Kumar Mot. at 2-3. They also ask for "all" Anom user data. Hosseini Mot. at 5.[13] The government addresses each of these requests below.

First, all Defendants have already been provided with all messages and data from the Anom devices each of them used. This discovery occurred promptly and upon the entry of a protective order as to each of the Defendants (and this discovery includes data from multiple devices for Hosseini and Kumar). The messages provided already include the JID for each Anom user—for Defendants' devices and the devices of all other users with whom they corresponded. The other Anom users Defendants corresponded with include users whose devices Defendants distributed or serviced. In addition, the messages produced show the name and/or alias(es) of Defendants and other users, insofar as an individual's identity has been attributed by agents to a particular JID. The "roster" Defendants mention, *see* Kumar Mot. at 2, thus is or will be incorporated into discovery already. Accordingly, the government's productions so far already address the bulk of Defendants' requests (a), (b), and (d) above.

Second, the government has already provided discovery of all FBI reports pertaining to each Defendant and, for some Defendants, multiple reports from foreign law enforcement relating to those particular Defendants, which were obtained through the MLAT between the United States and the relevant foreign country. Moreover, the Anom messages (including photos, videos, or other media or data within the messages) already produced provide the "documentary evidence" showing the Defendants' use of their respective devices. *See* Kumar Mot. at 2. In addition, the United States will continue to provide any additional reports that may be created or obtained during this case in accordance with its discovery obligations. As a result, the discovery already addresses the

---

[13] Hosseini's other requests, joined by Dmitrienko, Kumar, and Ayub, are discussed further below.

1 remainder of defense request (a) (seeking "documentary evidence" in addition to device

2 identifying information") and much of defense request (e) (seeking reports).

3 Defendants also specifically request the Anom "provisioning portal." Kumar Mot.

4 at 2. This was a website created by Anom distributors, not the FBI. For illustration: the FBI

5 obtained Anom data from the third country through the MLAT process, which consisted of

6 messages to and from users of the Anom platform. Some of these messages show or involve

7 discussion of the provisioning portal, which was a distinct site created by Anom

8 distributors rather than a site or source within the FBI's own control. To the extent the FBI

9 obtained information (like device information) from the portal, that information was

10 incorporated by the FBI into the Anom review platform and thus into the messages

11 themselves. Accordingly, the Anom data in discovery already involves and contains

12 information about the provisioning portal, and so Defendants will already have such

13 information through the messages themselves.

14 Third, on reporting and "Product Notes," Kumar Mot. at 3: the government will

15 continue to provide any reports in accordance with its discovery obligations, as noted; but

16 product notes will not be provided, particularly at this stage of the case. The FBI's review

17 platform for Anom messages allows reviewers to make notes in relation to particular

18 message strings (referred to as "products"). They are akin to rough notes, which are not

19 subject to discovery under Rule 16. A defendant is not entitled to rough notes because they

20 are not "statements" under the Jencks Act unless they constitute a substantially verbatim

21 narrative of a witness's oral statements or have been approved or adopted by the witness.

22 18 U.S.C. § 3500(e)(1), (2); *see, e.g.*, *United States v. Bobadilla-Lopez*, 954 F.2d 519, 522

23 (9th Cir. 1992); *United States v. Spencer*, 618 F.2d 605, 606-07 (9th Cir. 1980).

24 Accordingly, product notes will be preserved, but the United States will not be producing

25 them as part of Rule 16 discovery. The government is also aware of its *Jencks* obligations,

26 and if Defendants proceed to trial, and to the extent product notes include possible *Jencks*

27 material, then the government will provide disclosure if needed and at an appropriate time

28 in advance of trial.

1    Fourth, the government is willing to provide the messages of end-users with whom
2    Defendants corresponded, members of syndicates with which Defendants were in contact,
3    and each Defendant (i.e., each co-defendant's messages to all other co-defendants). This
4    discovery will further address Defendants' requests about end-users and identities of others
5    who used or serviced devices that Defendants distributed—requests (b), (c), and (d), listed
6    above—and for "all" Anom user data. Kumar Mot. at 2-3; Hosseini Mot. at 5. This
7    discovery is also expected to be very voluminous and many times larger than the discovery
8    already provided to any defendant so far. Defendants collectively communicated with
9    many syndicates (some of the same syndicates, and some different), and the government
10   believes this disclosure will involve messages of thousands of Anom users. For scale:
11   approximately 27 million messages were collected from a total of over 12,000 Anom
12   devices, which were distributed across more than 100 countries. Discovery of end-users'
13   and syndicates' messages will likely involve millions of messages, and the government
14   intends to work expeditiously to provide this information to Defendants.

15   The United States will not, however, provide "all" users' messages. *See* Hosseini
16   Mot. at 5. That would involve providing messages from Anom devices unrelated to
17   Defendants themselves. Of course, if the government were to use any of those users'
18   messages in its case-in-chief at trial, it will provide such information in accordance with
19   Rule 16(a)(1)(E)(ii). Otherwise, such users' messages are immaterial and irrelevant to
20   Defendants' own cases, and Defendants have not shown any materiality for *all* data
21   obtained in this investigation. *See Wolfenbarger*, 2019 WL 3037590, at *8. They are trying
22   to fish by trolling the entire ocean. Their request for all users' data should be denied.

23   Finally, as to request (d) and Defendants' reference to "communications link charts":
24   Defendants' (and other users') communications are or will be in discovery, and so the
25   substance of their communications and data about contacts with other users has been and
26   is being disclosed. The review platform for Anom messages enables the production of such
27   a link chart, but any such charts are matter of work product and the government's own
28   analysis based on Anom data and messages which, as discussed, will already be in

32

1  discovery. Communications link charts are not automatically generated, and the

2  government has no obligation to create charts or analytical tools at Defendants' request.

3  Accordingly, the government will provide additional discovery as described above,

4  and Defendants' requests should otherwise be denied.

5  **3.  Requests To Inspect Anom Devices, Network, and Materials**

6  Defendants' other discovery requests are generally immaterial and premature.

7  Except to the extent the government is willing to provide discovery as discussed here, they

8  should be denied.

9
10  **a.  The Asserted Basis for Defendants' Requests, and the Government's Disclosure**

11  Defendants separately move to (a) inspect an Anom device, (b) inspect "the Anom

12  Network," (c) obtain a "complete copy" of all Anom server data, and (d) obtain all manuals

13  relating to Anom. Hosseini Mot. at 4-5. They assert they need this discovery to determine

14  the "reliability" of the evidence and authenticity of evidence presented at trial. *Id.*; *see also*

15  Defs. Mot. at 11 (seeking discovery regarding the third country because "[t]hat is the only

16  way the defense can assess the authenticity and reliability of the messages for purposes of

17  evidentiary challenges in limine and at trial.").

18  At the outset, Hosseini's motion (joined by Dmitrienko, Ayub, and Kumar)

19  mischaracterizes Anom and the process by which messages were collected. Defendants

20  claim that the government "employ[ed] a hacking technique referred to as a man in the

21  middle attack." Hosseini Mot. at 2. That is incorrect. As described in the technical

22  documents already produced and the facts above, *see* Section II.B, Anom messages were

23  collected, in summary, through an encrypted, BCC of a user's message being routed to the

24  server in the third country, where the message was decrypted, re-encrypted, and ultimately

25  routed to another server for viewing by the FBI. This process with the third country

26  occurred via the MLAT. There was no "man-in-the-middle." Defendants also premise their

27  requests on the notions that this process involved "trips through several routers and data

28  storage centers," and "the accuracy of the location data intercepted is at issue." Hosseini

Mot. at 2. Their claim about multiple servers or means of storage is a red herring. It makes too much of the process of the data's collection in the third country and provision to U.S. authorities through the MLAT. That point and Defendants' assertions about location data do not establish materiality and are matters of foundation, authentication, and reliability of the evidence at trial, as discussed below.

To Defendants' first request—to inspect an Anom device—they may do so. The United States will arrange for the defense to inspect a device. Of course, and as the government has advised defense counsel, the Anom platform is no longer live, and so the devices do not allow someone to use the Anom platform as Defendants and thousands of other criminal users did before the takedown in June 2021. Moreover, Anom devices do not support forensic examination or extraction. In any event, the government is willing and intends to allow defense counsel to inspect an Anom device.

Next, Defendants' last request, for all technical manuals, should be denied because nothing more exists. And the government should not be required to create any new materials. Discovery as to all Defendants already includes detailed technical documents about the Anom platform, which include discussion of the manner of collection, the interface, and review of messages, among other things. As noted above, this and other materials in discovery also provide Defendants with sufficient information to challenge the collection of messages should they wish to do so. The government does not have any other "original technical manuals written to create and maintain" the Anom platform. *See* Hosseini Mot. at 5. This request should therefore be denied.

### b.   Defendants Have Not Shown Materiality

Defendants' remaining requests should also be denied. Hosseini's motion invokes the notion that the reliability of "the Anom network" must be evaluated, and the platform could produce "unreliable results." *Id.* Defendants propose inspecting all servers and storage platforms involved in the collection and review of Anom messages. *Id.* That is out of step with discovery rules and obligations.

In seeking discovery under Rule 16(a)(1)(E)(i) on the ground that the information sought is material to preparing the defense, a defendant must make a threshold showing of materiality. *See Mandel*, 914 F.2d at 1219; Fed. R. Crim. P. 16(a)(1)(E)(i) (requiring disclosure, upon a defendant's request of items "material to preparing the defense"). To satisfy this burden, a defendant must present facts tending to show that the government is in possession of information helpful to the defense. *United States v. Budziak*, 697 F.3d 1105, 1111-12 (9th Cir. 2012) ("Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense." (citation omitted)); *see also United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984) (to obtain discovery under Rule 16, a defendant must make a *prima facie* showing of materiality).

Defendants present in their motion to compel exactly what the courts have declared to be insufficient: a general description of the information sought and conclusory allegations of materiality. Hosseini's motion requests to inspect "the Anom Network," obtain a "complete copy" of all Anom server data, and obtain all manuals relating to Anom, asserting Defendants need this discovery to determine the "reliability" and authenticity of the evidence. Hosseini Mot at 4-5; *see also* Defs. Mot. at 11. These types of speculative claims, including about discovery of software or source code, have been soundly rejected by courts across the country. *See, e.g.*, *Pirosko*, 787 F.3d at 366-67 (affirming the denial of a motion to compel production of law enforcement P2P software, holding in part that a defendant's conclusory allegations were insufficient to compel disclosure and that instead a defendant must produce some evidence of government error or wrongdoing); *United States v. Chiaradio*, 684 F.3d 265, 277-78 (1st. Cir. 2012) (affirming denial of defense request for underlying source code of law enforcement child pornography P2P investigative tool); *United States v. Feldman*, No. 13- CR-155, 2015 WL 248006 at *6 (E.D. Wisc. Jan. 19, 2015) (denying defendant's motion to compel production of law enforcement P2P investigative tool because defendant failed to establish materiality);

35

*United States v. Brashear*, No. 11-CR-0062, 2013 WL 6065326, at *2-*4 (M.D. Pa. Nov. 18, 2013) (holding that source code was not discoverable); *State v. Roberts*, 345 P.3d 1226, 1237-38 (Utah 2015) (holding that trial court did not abuse its discretion in denying defendant's motion to obtain copy of law enforcement P2P program and accompanying documents). The *Pirosko* court reasoned that "allowing [the defendant] access without any evidence of error would needlessly expose the government's enforcement tools to examination and pointlessly drag out the course of litigation." 787 F.3d at 367. Similarly, in *United States v. Hoeffener*, the Eighth Circuit held that "mere speculation that the software program could possibly access non-public areas of [the defendant's] computer or that there was a possibility that it malfunctioned during the investigation into [his] sharing of child pornography is insufficient to meet the requisite threshold showing of materiality to his defense." 950 F.3d 1037, 1044 (8th Cir. 2020).

In *Budziak*, the defendant identified two specific defenses for which discovery into the law enforcement BitTorrent program would be material. 697 F.3d at1112. Firstly, the defendant presented evidence that the FBI might have only downloaded fragments of files from his folder of incomplete files, making it more likely that he did not knowingly distribute child pornography. *Id.* Secondly, the defendant presented evidence suggesting that the law enforcement BitTorrent program could override his sharing settings. *Id.*

Here, in contrast, Defendants have presented nothing to support any of their speculative claims about the Anom platform or potential government wrongdoing. They have failed to meet their threshold burden of materiality for his request for discovery into the Anom program and related material, and instead seek to merely to go on a fishing expedition based on speculation and conclusory allegations of the type that have been soundly rejected. Moreover, the law enforcement privilege discussed above applies to these discovery requests, too. The Court should deny the motion to compel on these bases.

### c.   Defendants' Requests Are Premature, at Best

The issues Hosseini's motion raises are also premature and unfounded at this stage of the case. The request to inspect "the Anom Network" including servers, for instance, is

analogous to a defendant's request to inspect the entire AT&T network in a wiretap case in which AT&T was the cellular provider for a defendant's phone; or to inspect Google servers in a case involving emails obtained pursuant to a search warrant for a Gmail account; or to inspect all government computers involved in the Cellebrite extraction and review relating to the search of a defendant's cellphone. Defendants' requests are likewise misplaced.

In reality, these are matters of authenticity and admissibility of the evidence at trial. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); *United States v. Harrington*, 923 F.3d 1371, 1374 (9th Cir. 1991). And authentication is just "a special aspect of relevancy." Fed. R. Evid. 901(a), Advisory Comm. note; *see United States v. Perlmutter*, 693 F.2d 1290, 1292 (9th Cir. 1982). At trial, the government will lay the foundation and establish the authenticity of the Anom evidence. But there is no valid basis for Defendants' requests set forth in Hosseini's motion, especially at this point in the case, and these requests should be denied.

Accordingly, the government is willing to provide some additional disclosure and the opportunity to inspect a device, as discussed in this and the previous section of this response, and the Court should otherwise deny Defendants' discovery requests.

## 4.    Ayub's Request To Return Luxury Watches

In addition to the above discovery requests, Defendant Ayub asks the Court to "make a finding that no nexus exists between [his] property and the underlying case" and to "return his property now … rather than waiting for a forfeiture hearing that may occur on some unknown date in the future." Ayub Mot. at 7. Although Ayub has not specified the legal basis of his motion for return of property, Federal Rule of Criminal Procedure 41(g) states that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return" by filing a motion "in the

1   district where the property was seized." Fed. R. Crim. P. 41(g). The United States' response

2   to Ayub's motion is tailored accordingly.

3       The Baume & Mercier and Tag Heuer watches Ayub seeks to recover were seized

4   by Dutch law enforcement agents at the time of Ayub's arrest and were subsequently

5   transported to the United States pursuant to the forfeiture provisions in the Indictment and

6   well-established forfeiture law and the MLAT between the United States and the

7   Netherlands. The government has properly retained these items. *United States v. Lacey*,

8   378 F. Supp. 3d 814, 820 (D. Ariz. 2019) ("Allowing pretrial restraint of assets is consistent

9   with the long-recognized and lawful practice of vesting title to any forfeitable assets, in the

10  United States, at the time of the criminal act giving rise to forfeiture . . . [to] ensure[] any

11  ill-gotten gains will not dissipate before conviction and protects the community's interest

12  in recovery." (quotation marks omitted)). Following the receipt of the items seized by

13  Netherlands law enforcement, the United States filed a Bill of Particulars identifying the

14  watches as items subject to forfeiture.  Dkt. 141.

15      Notwithstanding that the criminal proceedings in this case are ongoing, Ayub now

16  seeks the return of the watches on the basis that they are not proceeds of the crime and that

17  they have significant sentimental value. However, where an indictment includes a

18  forfeiture allegation and the United States has filed a bill of particulars identifying the

19  specific items as property to be forfeited, the defendant is not entitled to a post-restraint,

20  pretrial hearing on the issue of probable cause. *United States v. Travers*, No. 96-477-CR-

21  UNGARO-BENAGES(s)(s), 1997 WL 35430441, at *2 (S.D. Fla. Apr. 8, 1997) (citation

22  omitted) (finding that defendant was "not entitled to a post-restraint, pretrial hearing on the

23  issue of probable cause where a grand jury has determined that specific property is subject

24  to forfeiture"). The Indictment, Superseding Indictment, and Bill of Particulars here do just

25  that. Under these circumstances, Ayub's remedy (and the only remedy) is to contest

26  forfeiture of the watches at the conclusion of the criminal proceeds against him. *See United

27  States v. Durante*, No. 11–277 (SRC), 2012 WL 2863490, at *1 (D.N.J. July 11, 2012)

28  ("Ordinarily, the inclusion of the forfeiture allegation in the indictment is sufficient to bar

the return of money unless and until a trier of fact determines whether the funds are subject to forfeiture." (citation omitted)); *see also United States v. Hills*, No. 1:16CR329, 2018 WL 1621088, at *8 (N.D. Ohio Apr. 4, 2018) (holding that defendant's remedy when seeking return of seized currency subject to forfeiture allegations in an indictment "lies in contesting forfeiture at the conclusion of the criminal proceedings" (citation omitted)).

Ayub has not demonstrated any economic or other urgent need for the recovery of his watches such that any exception should be made to the practice of holding forfeiture hearings after trial. *See United States v. Bluearm*, No. 4:22-CR-40040-LLP, 2022 WL 1500632, at *2 (D.S.D. May 12, 2022) (observing in response to a pre-trial motion for recovery of money that the "proper forum for [defendant] to litigate her right to possession of the $3,000 at issue [was] within the confines of the forfeiture proceedings" and that defendant "ma[de] no allegation that the forfeiture proceedings do not provide her with equitable or just means to assert her claim or an adequate remedy at law"); *United States v. Sullivan*, 575 F. Supp. 3d 1, 7 (D.D.C. 2021), *reconsideration denied*, No. CR 21-78 (EGS), 2022 WL 3027007 (D.D.C. Aug. 1, 2022) (noting that defendant did not "provide[] any evidence demonstrating that he [was] unable to pay for rent or other household necessities without the seized assets" such that he would be "significantly harmed if adjudication of his claim is delayed until a post-trial proceeding"). Indeed, Ayub appears to concede that the sole reason he seeks the return of the watches is because they are "sentimentally valuable" to him. Ayub Mot. at 5. They may be, but Ayub will have the opportunity to contest forfeiture of his watches at a post-trial hearing. That is the proper course here.

Absent any reason to depart from established procedure in adjudicating forfeiture claims, the Court should deny Ayub's motion for return of property.

### 5.    Elhassen's Remaining Requests

Finally, Elhassen raises several routine discovery requests, which the government understands are to preserve his rights. The government has separately discussed discovery with Elhassen's counsel, who has confirmed that are no specific discovery issues or

disputes at this time. As noted above, Elhassen also has not joined the other Defendants' discovery motions.

The United States is aware of and continue to satisfy its obligations under *Brady*, Rule 16, and *Giglio*, and it will conduct an inquiry pursuant to *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991), as appropriate. Regarding Elhassen's request for preservation of evidence, Elhassen Mot. at 5-6: the United States will try to preserve all evidence to which he and other Defendants are entitled, but it objects to any global request for preservation of all evidence as contrary to *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) (improper and unwise to impose on the government "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution"). Accordingly, no order compelling discovery or requiring preservation of evidence as to Elhassen should be issued, and his motion should be denied.

## IV.   **CONCLUSION**

For the foregoing reasons, the government will provide discovery as set forth above, and Defendants' discovery motions should otherwise be denied.

DATED:      August 3, 2023                    Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

*/s/ Mikaela L. Weber*
JOSHUA C. MELLOR
MIKAELA L. WEBER
PETER S. HORN
Assistant U.S. Attorneys
Attorneys for the United States