Patrick M. Griffin [SBN 276171]
Griffin Law Office, APC
1350 Columbia St., Suite 401
San Diego, CA 92101
Telephone: (619) 269-2131
Patrick@GriffinLawOffice.com

Attorney for Defendant,
ALEXANDER DMITRIENKO

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ALEXANDER DMITRIENKO,<br><br>Defendant. | Case No.: 21-cr-1623-JLS<br><br><br>MOTION TO DISMISS THE INDICTMENT |

## I.
## Introduction

Anom was a government invention.  As the prosecution has publicly stated, it "created, managed and controlled the undercover business of distributing the devices used by the criminals across the globe and oversaw the collection of the information."[1],[2]  This admission

---

[1] Unless otherwise noted, within quotations, all emphasis is added and all internal citations as well as internal quotation marks are omitted.

[2] 2023 Service to America Medals: Safety, Security and International Affairs, available at https://servicetoamericamedals.org/honorees/joshua-mellor-nicholas-cheviron-and-stephanie-stevens/

1

has significant legal consequences.  *See United States v. Mirabal*, 98 F.4th 981, 987 (9th Cir. 2024) ("in criminal cases, the Justice Department certainly should be considered a party-opponent of criminal defendants.").

Under controlling Ninth Circuit law, the "[o]utrageous government conduct [] standard [for dismissal] is met *when the government engineers and directs a criminal enterprise from start to finish*." *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003). Here, the government has repeatedly bragged about doing just that. The indictment, therefore, "must be dismissed" under principles of due process, at least as to Mr. Dmitrienko.  *See United States v. Williams*, 547 F.3d 1187, 1199-2000 (9th Cir. 2008).

Although such dismissals are (and should be) rare, this is the rarest of cases.  There is no historical precedent for Anom.  The FBI, in coordination with the USAO for the Southern District of California, created an entire company and then manufactured and marketed its own phones around the world to facilitate, and then intercept, user communications outside the strictures of the Fourth Amendment.

And while the government's crime-fighting goals were no doubt laudable, in the law, the ends do not justify the means.  The government crossed the line from investigating criminal enterprises to

creating one. This is more than the Constitution will tolerate. Under Ninth Circuit law, the remedy is dismissal.

## II.
## Relevant Facts

The relevant facts come directly from the government. They are undisputed.

In an interview available on YouTube, Supervisory Special Agent Stephanie Stevens described the Anom program succinctly as "an FBI investigation . . . where we [the FBI] led and distributed our own encrypted communication devices."[3]

The groundwork for Anom – what AUSA Mellor publicly called an "unprecedented" operation[4] – began "[i]n 2017, [when] FBI San Diego began investigating a company named Phantom Secure which provided hardened encrypted devices [essentially a phone that (1) sends and receives encrypted electronic communications, and/or (2) encrypts the data stored on the device.]." Dckt. 161 at 26.[5] "The

---

[3] https://www.youtube.com/watch?v=wIP_S5aPsGA&t=63s at 0:50-0:54.

[4] 2023 Service to America Medals, *supra*, at fn. 2.

[5] Dckt. 161 is the Defendants' joint motion to compel discovery and the attached appendix, which contains Agent Cheviron's affidavit in support of the search warrant application to Google. Rather than refile the appendix, Mr. Dmitrienko will cite to Dckt. 161.

investigation uncovered the use of Phantom Secure devices all around the world by criminal syndicates." Dckt. 161 at 26.

In 2018, during the Phantom Secure investigation, "San Diego FBI agents recruited a Confidential Human Source ('CHS') who had been developing the 'next generation' encrypted communications product, poised to compete for market share against established hardened encrypted device competitors. At the time, the void created by Phantom Secure's dismantlement provided a new opportunity for criminal users to switch to a new, secure brand of device[.]" Dckt. 161 at 28.

The FBI then worked with the CHS to create, market, and manage the new Anom devices. "By introducing Anom to the CHS's trusted distributors, who were likewise trusted by criminal organizations, the FBI aimed to grow the use of Anom organically through these networks." Dckt. 161 at 29.

To meet this goal, "[t]he FBI opened a new covert investigation, Operation Trojan Shield, which centered on exploiting Anom by inserting it into criminal networks and working with international partners . . . to monitor the communications. Before the device could be put to use, however, the FBI [] and the CHS built a master key into the existing encryption system which surreptitiously attaches to each

message and enables law enforcement to decrypt and store the message as it is transmitted." Dckt. 161 at 29. "The [] encrypted message then passes to a second FBI-owned iBot server, where it is decrypted and its content available for viewing in the first instance." Dckt. 161 at 29.

As noted, in the FBI's own words, it "created, managed and controlled the undercover business of distributing the [Anom] devices used by the criminals across the globe, and oversaw the collection of the information." 2023 Service to America Medals, *supra*, at fn. 2. Beyond this, FBI Assistant Special Agent in Charge Jamie Arnold has publicly commented that the case agents, FBI SA's Cheviron and Stevens, "lived and breathed the case for several years, playing instrumental roles *in developing the concept for the operation and its execution.*" *Id.*

In additional comments to the press, SA Stevens elaborated on the details of building the enterprise: "[F]irst, we [the FBI] had to build a device that could compete, could operate, could function like these normal devices do, but also on the back end be able for law enforcement

to read and review the messages."[6]  The FBI also had to purchase the hardware.  *Id.*  SA Stevens continued: "beyond building the company, the application we [the FBI] also had to build a strategy on how we were going to deal with the data." *Id* at 7:58 − 8:05.  And that, of course, led the government to its partnership with the third country.

In summary, the government has repeatedly admitted to designing, creating, building, funding, marketing, distributing, operating, and controlling the Anom devices and the Anom program. In undertaking these unprecedented actions to develop and facilitate a criminal enterprise, the government crossed a constitutional line.

### III.
### Discussion

Claims of government misconduct are too frequently bandied about with little concern for the merits or repercussions.  This motion is not that.  It is not an attack on the motives or morality of the prosecutors or the agents.  Instead, this claim is based on a simple but important principle of law − the government cannot create its own criminal networks.  That is a step too far.

---

[6] Operation Greenlight Part 1: The International Sting *The Europol Podcast,* at 8:06-8:17, available at *https://open.spotify.com/episode/1h5tM5YXc6efHV9iBGhjDu?si=M5U tT0J6QLyPueQtJpTccA&nd=1&dlsi=a52e5d66ee4b4264*

This principle falls under the umbrella of "outrageous government conduct," but it is not the same as alleging *mis*conduct. Instead, the point is that when the government's actions in securing an indictment violate "due process values[,] the indictment must be dismissed." *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008).

As relevant here, "'this standard is met when the government engineers and directs a criminal enterprise from start to finish, but is not met when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning to participate in the conspiracy, or provides valuable and necessary items to the venture.'" *Id.* (citing *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003)). Importantly, "[e]ven when a defendant is predisposed to commit an offense, his conviction may be overturned if the government is so involved in the criminal endeavor that it shocks our sense of justice and violates due process." *United States v. So*, 755 F.2d 1350, 1353 (9th Cir. 1985).

Although there is no specific test, "previous outrageous government conduct cases, viewed collectively, have identified various factors as relevant to whether the government's conduct was outrageous: (1) known criminal characteristics of the defendants; (2)

individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue." *United States v. Black*, 733 F.3d 294, 303 (9th Cir. 2013).

As to these factors, "the first three are most relevant to the way in which the government set up the sting; the fourth and fifth look to the propriety of the government's ongoing role in the sting. The last focuses on the justification for the particular law enforcement strategy employed." *Id.* at 303-04. "These [factors] do not constitute a formalistic checklist, but help focus [the] analysis of the totality of circumstances." *Id.* at 304.

Following the Ninth Circuit's guidance, the defense addresses these factors in turn as part of the totality of the circumstances.

## A.   Taken together, the factors weigh heavily in favor of dismissal.

Factor One.

As noted, factor one is the "known criminal characteristics of the defendants," and the analysis focuses on "the way in which the government set up the sting." *Id.* at 303-04. Under this factor, the

question is "whether a defendant had a criminal background or propensity *the government knew about* when it initiated its sting operation." *Id.* at 304.

Here, when the government began building the Anom program and initiated the Trojan Shield investigation, it knew nothing about Mr. Dmitrienko's characteristics, criminal or otherwise. Indeed, there is no evidence United States law enforcement had ever heard of him. Thus, factor one favors dismissal.

Factor Two.

Factor two is individualized suspicion, which also focuses on how the government set up the enterprise. "Whether the government had reason to suspect an individual or identifiable group *before initiating a sting operation is an important consideration*[.]" *Id.* at 305.

Here again, before initiating Operation Trojan Shield, the government had no reason to suspect Mr. Dmitrienko of anything. That said, the government did have some reason to suspect an arguably identifiable group – non-U.S. citizens who use hardened encrypted devices. As such, the two considerations balance out. Because there was no reason to suspect Mr. Dmitrienko, but there was some basis to suspect those who would use Anom devices, this factor is neutral or slightly favors the government.

<u>Factor Three</u>.

Next is the government's role in creating the crime, which is the final factor focusing on how the government set up the enterprise. The crime charged here is RICO – *not* substantive drug trafficking or money laundering – and the indictment alleges that Anom *is* the RICO enterprise. The analysis, therefore, focuses on the government's involvement in creating that enterprise. *See Black*, 733 F.3d at 303.

Here, it was beyond extensive; it was total. The government developed, funded, managed, and controlled the Anom devices and back-end encryption service with the specific intent to create a criminal enterprise. *See* indictment, Dckt. 1 at 1, 3-4. In the government's words, it "created, managed and controlled the undercover business of distributing the devices used by the criminals across the globe, and oversaw the collection of the information." 2023 Service to America Medals, *supra*, at fn. 2.

As such, it is beyond dispute that the government was instrumental in creating the sole crime charged in the indictment. Without the government, the Anom enterprise would not and could not have existed. This factor, therefore, weighs heavily in favor of dismissal.

Factor Four.

Factor four is the government's encouragement of the defendants to commit the offense conduct. As the Ninth Circuit has explained, "[t]he extent to which the government encouraged a defendant to participate in the charged conduct is important, with mere encouragement being of lesser concern than pressure or coercion." *Black,* 733 F.3d at 308.

The entire purpose of Operation Trojan Shield was to encourage the users to engage in the charged criminal conduct, i.e., the RICO conspiracy, so the government could intercept their messages and prosecute them. The government, therefore, designed Anom specifically to facilitate and encourage the offense conduct. The government, therefore, played a critical role. However, there is no evidence the government engaged in threats or coercion. Thus, because the government heavily encouraged but did not coerce criminal conduct, this factor is balanced out as neutral.

Factor Five.

The next factor is the government's participation in the crime, under which "[t]he *duration* of the government's participation in a criminal enterprise is significant, with participation of longer duration being of greater concern than intermittent or short-term government

involvement." *Id.* (emphasis in original). The Ninth Circuit has also "looked to the *nature* of the government's participation—whether the government acted as a partner in the criminal activity, or more as an observer of the defendant's criminal conduct." *Id.* (emphasis in original). Finally, it has considered "the *necessity* of the government's participation in the criminal enterprise—whether the defendants would have had the technical expertise or resources necessary to commit such a crime without the government's intervention. *Id.* at 309 (emphasis in original).

Looking first at *duration*, the government participated in the Anom program for several years, which was the entire duration of the program. Thus, because its "participation [was] of longer duration [it is] of greater concern." *Id.* at 308.

Moving to the *nature* of the government's participation in the "offense conduct." Although there is no evidence of government agent (or informant) involvement in drug sales, the offense conduct here is the RICO conspiracy. And because the government created and facilitated the RICO enterprise, it certainly acted as a partner in the charged offense conduct.

To this end, the *necessity* of the government's participation in the criminal enterprise is striking. By its own admission, the government

created the Anom enterprise, which was no easy task. It required sophisticated and technical government skills to build and maintain the devices and the encryption network. Simply stated, Anom would never have existed without the government.

Accordingly, because the government's participation in the Anom enterprise was extensive, factor five weighs in favor of dismissal.

Factor Six.

The sixth and final factor is the nature of the crime being pursued and the necessity for the actions taken in light of the nature of the criminal enterprise at issue.

Here, Anom was not a preexisting group that needed to be investigated, it was a government creation. Moreover, of the millions of intercepted messages, only a handful related to alleged drug shipments bound for the United States, with the overwhelming majority destined for Europe and some within Australia. And for Mr. Dmitrienko specifically – the movant here – the government has not alleged *any* drug trafficking activity in this country.

Additionally, the most significant domestic threats currently come from fentanyl and methamphetamine. These drugs come from Mexico where, tellingly, not a single Anom device was sold or used. Thus, focusing on domestic concerns, there was little need for the FBI

to spend vast sums of United States taxpayer dollars to create and manage Anom.

Beyond these factual points, the Ninth Circuit has held that "[l]aw enforcement conduct becomes constitutionally unacceptable where government agents engineer and direct the criminal enterprise from start to finish." *United States v. Emmert*, 829 F.2d 805, 812 (9th Cir. 1987). And "[g]eneration of new crimes merely for the sake of pressing criminal charges against the defendant [] constitutes outrageous government conduct." *Id.*

Here, that is precisely what occurred. While undercover investigations into criminal organizations are nothing new, this investigation was different in *kind*. This was not a run-of-the-mill sting operation or a wiretap investigation. Instead, for the first time in history, the government engineered its own RICO enterprise to manufacture a RICO conspiracy. Accordingly, the sixth factor also weighs heavily in favor of dismissal.

In summary, while the second and fourth factors are neutral (or slightly favor the government), the first, third, fifth, and sixth factors strongly support granting this motion and dismissing the indictment. So does the case law.

14

**B.   Precedent supports dismissal.**

In *Greene v. United States*, 454 F.2d 783, 786 (9th Cir. 1971), the government, through an undercover agent, initiated contact with the defendants for the purpose of running an illegal bootlegging operation. The undercover agent's "involvement in the bootlegging activities was not only extended in duration, but also substantial in nature." *Id*. The defendants were ultimately convicted of multiple counts related to the operation.

In reversing the convictions, the Ninth Circuit explained, "[the] Government [] did not simply attach itself to an on-going bootlegging operation for the purpose of closing it down and prosecuting the operators.  Any continuing operation had been terminated with the 1962 raid and arrest.  We think, rather, that the procedure followed by [the undercover agent] in this case helped first to reestablish, and then to sustain, criminal operations which had ceased with the first convictions." *Id.* at 787.

The court held that the government could not "involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators." *Id.*  The court stated, "when the Government permits itself to become enmeshed in criminal activity, from beginning to end,

to the extent which appears here, the same underlying objections which render entrapment repugnant to American criminal justice are operative." *Id.*

The Second Circuit reached a similar conclusion in *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973).  There, law enforcement officers created an undercover operation to investigate suspected corruption and public bribery in the New York City criminal justice system.  *Id.* at 672-674.  During the investigation, the government arranged for the defendants to make three out-of-state phone calls – an element of the Federal Travel Act, 18 U.S.C. § 1952.  *Id.*

Following the investigation, the defendants were convicted of that crime.  The Second Circuit vacated the convictions and dismissed the indictment because "the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present." *Id.* at 682.  The court was also concerned with the nature of the operation itself: "Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality." *Id.* at 677.

In analogous circumstances, the Third Circuit vacated the

16

defendants' convictions in *United States v. Twigg*, 588 F.2d 373, 375-76 (3d Cir. 1978).   In that case, the DEA directed a government informant to contact the defendants to start and operate an illegal drug laboratory.   The government supplied money, the facilities, chemicals, and the chemical expertise to the defendants.   *See id.*

The Third Circuit noted that the criminal enterprise could not have succeeded without the government's contribution of money and resources, and neither defendant had the chemical knowledge to conduct the enterprise on their own. *See id.* at 380-81.   On that basis, the court reversed, holding "the governmental involvement in the criminal activities of this case has reached a 'demonstrable level of outrageousness.'" *Id.* at 380.

These three cases – *Greene*, *Archer*, and *Twigg* – add considerable weight to Mr. Dmitrienko's argument.

Here, as in *Greene*, the government "did not simply attach itself to an on-going [] operation for the purpose of closing it down and prosecuting the operators." 454 F.2d at 787.   In fact, the government had already shut down existing encrypted device companies (such as Phantom Secure), thereby creating the demand for the Anom service it would then create and supply.   As the government admits, "the void created by Phantom Secure's dismantlement provided a new

opportunity for criminal users to switch to a new, secure brand of device[.]" Dckt. 161 at 28.  So just like *Greene*, "the procedure followed by [the government] in this case helped first to reestablish, and then to sustain, criminal operations which had ceased."  454 F.2d at 787.

Moreover, as in *Archer*, "the federal officers themselves supplied the interstate [and foreign commerce] element" by providing devices to communicate with each other over international borders.  486 F.2d at 682.  And like *Twigg*, the criminal enterprise could not have succeeded without the government's contribution of money and resources.  *See* 588 F.2d 380-81.

Accordingly, as in those cases, the government's conduct crossed the constitutional line from investigating criminal enterprises to creating one.

One final point.  While the defense is not seeking to relitigate the Court's decision denying our motion to compel unredacted discovery, the impact of that ruling on this motion is substantial.  Because the government has been allowed to withhold all information about the key participants in the Anom program in the third country, the defense has been unable to interview them.

We have a good faith basis to believe those interviews would have provided significant additional evidence that the government created

and controlled every facet of the Anom program.  However, because the defense was denied access to that material – even under an "attorney's eyes only" protective order – we have been hampered in our ability to conduct a full investigation and to develop a complete factual record.

Despite that impediment, for the reasons discussed, Mr. Dmitrienko has sufficiently shown that the government's actions in designing, creating, funding, and managing the Anom enterprise went too far.  Returning to controlling Ninth Circuit law, the standard for dismissal "is met when the government engineers and directs a criminal enterprise from start to finish[.]" *Williams*, 547 F.3d at 1199.

Accordingly, because the government engineered and directed the Anom enterprise from start to finish, Mr. Dmitrienko respectfully requests the Court grant this motion and dismiss the indictment as to him. *See Dennis v. United States*, 339 U.S. 162, 168 (1950) ("the trial court must be zealous to protect the rights of an accused.").

Dated: July 11, 2024          Respectfully submitted,

*s/ Patrick M. Griffin*