TARA K. McGRATH
United States Attorney
JOSHUA C. MELLOR
California Bar No. 255870
MIKAELA L. WEBER
California Bar No. 279391
PETER S. HORN
California Bar No. 321358
New York Bar No. 5333653
Assistant U.S. Attorneys
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel: 619-546-9733/9734/6795
joshua.mellor@usdoj.gov
mikaela.weber@usdoj.gov
peter.horn@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> SEYYED HOSSEIN HOSSEINI (5), <br> ALEXANDER DMITRIENKO (6), <br> AURANGZEB AYUB (10), <br> DRAGAN NIKITOVIC (12), <br>   aka Dr. Djek, <br> SHANE NGAKURU (13), <br> MIWAND ZAKHIMI (16), <br>   aka Maiwand Zakhimi, <br><br> Defendants. | Case No.: 21-CR-1623-JLS <br><br> **UNITED STATES' RESPONSE IN OPPOSITION TO DMITRIENKO'S MOTION TO DISMISS INDICTMENT** <br><br> Date: August 29, 2024 <br> Time: 10:00 a.m. <br> Courtroom: 4D <br> Honorable Janis L. Sammartino |

## I. INTRODUCTION

Dmitrienko's motion to dismiss must be denied. He alleges "outrageous government conduct," but under clear case law, he cannot come close to showing anything outrageous about the government's investigation of the Anom Enterprise and prosecution of the Defendants in this case.[1]

## II. FACTS

Given the Court's familiarity with the case from prior briefing, the United States incorporates and refers to the facts set forth in its response to the Defendants' motion for discovery, Dkt. 169 at 1-5, and the public search warrant affidavit of FBI Special Agent Nicholas I. Cheviron, filed as an appendix to the Defendants' motion to compel discovery, Dkt. 161, App. ("Cheviron Aff."). Certain additional facts are incorporated in the analysis below.

## III. ARGUMENT

Dmitrienko argues the Superseding Indictment, Dkt. 68, should be dismissed because the government was involved in Anom and the criminal enterprise. He claims there was "outrageous government conduct" that "crossed a constitutional line" because of the government's role in "designing, creating, building, funding, marketing, distributing, operating, and controlling the Anom devices and the Anom program." Dkt. 320 (Dmitrienko Mot. To Dismiss) at 6, 7. Dmitrienko's argument proceeds through each of six factors he claims support the extraordinary step of dismissal, saying (1) the first factor, known characteristics of the defendants, supports dismissal because the government knew nothing about his characteristics when the investigation was initiated; (2) the second factor, individualized suspicion, favors the government or is neutral because, despite "no reason to suspect Mr. Dmitrienko of anything," the government did have reason to suspect illegal activity by the users of hardened encrypted devices; (3) the third factor, the government's

---

[1] This motion is captioned as to all Defendants insofar as Defendants other than Dmitrienko have joined or may join his motion. *See* Dkt. 321, 322, 323, 329 (Nikitovic's, Ayub's, Zakhimi's, and Hosseini's motions for joinder).

role in "creating the crime," favors dismissal because the government's involvement "was total"; (4) the government's encouragement to commit the offense conduct, factor four, is neutral because the government "played a critical role" but "there is no evidence the government engaged in threats or coercion"; (5) the fifth factor, the government's participation, likewise favors dismissal because of the duration and "nature" of law enforcement's involvement—as a "partner"—in the offense conduct; and (6) finally, the nature of the crime pursued and necessity of actions taken in light of the enterprise also support dismissal because, "for the first time in history, the government engineered its own RICO enterprise to manufacture a RICO conspiracy." *Id.* at 8-14.

Dmitrienko is wrong. He conflates facts and legal principles that sink his motion. He also cannot meet the standard for "outrageous government conduct," for the reasons discussed below.

A. **Legal Framework**

Dmitrienko makes various references to the U.S. Constitution but does not specify the basis for his motion, other than alleging "outrageous government conduct." *See* Dmitrienko Mot. To Dismiss at 7. According to legal precedent, that theory comes under the Due Process Clause of the Fifth Amendment. *E.g.*, *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008) (citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973)); *United States v. Dominguez-Caicedo*, 40 F.4th 938, 949 (9th Cir. 2022) (same). It is not a defense; it's an affirmative "claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed." *Williams*, 547 F.3d at 1199 (citation omitted). This presents an insurmountable hurdle for him. The case Dmitrienko relies on more than any other makes this clear. *See* Dmitrienko Mot. To Dismiss at 7-12 (citing *United States v. Black*, 733 F.3d 294 (9th Cir. 2013)).

"Outrageous government conduct" is an "extremely high standard." *Black*, 733 F.3d at 302 (quoting *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993)). Such conduct "occurs when the actions of law enforcement officers or informants are 'so outrageous that due process principles would absolutely bar the government from invoking

1 judicial processes to obtain a conviction.'" *Id.* (quoting *Russell*, 411 U.S. at 431-32). Dismissal of an indictment on this theory is extraordinary—only in "extreme cases"—and only when the defendant can show the government's conduct "violates fundamental fairness and is so grossly shocking and so outrageous as to violate the universal sense of justice." *Id.* (quoting *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (internal quotation marks omitted)); *accord United States v. Hullaby*, 736 F.3d 1260, 1262 (9th Cir. 2013).

As the Ninth Circuit has also explained, "[t]he government's involvement must be *malum in se* or amount to the engineering and direction of the criminal enterprise from start to finish." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991) (citing *United States v. Citro*, 842 F.2d 1149, 1153 (9th Cir. 1988)). The term *malum in se* is instructive in itself. That means "[a] crime or act that is inherently immoral, such as murder arson, or rape." Black's Law Dictionary (malum in se) (12th ed. 2024). So, the conduct of law enforcement "must be 'repugnant to the American system of justice.'" *Smith*, 923 F.2d at 897 (quoting *Shaw v. Winters*, 796 F.2d 1124, 1125 (9th Cir. 1986)).

Altogether, as Dmitrienko notes, the Ninth Circuit has described several factors to consider in assessing a defendant's claim of outrageous government conduct—not a "formalistic checklist," but "focus[ing on]…analysis of the totality of the circumstances:

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

*Black*, 733 F.3d at 303; *accord United States v. Pedrin*, 797 F.3d 792, 796 (9th Cir. 2015).

As to enterprises: precedent also establishes that there is no outrageous conduct "when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning to participate in the conspiracy, or provides valuable and necessary items to the venture." *United States v. Gurolla*, 333 F.3d 944, 950

(9th Cir. 2003) (citing *United States v. So*, 755 F.2d 1350, 1353 (9th Cir. 1985)). Dmitrienko himself admits this. Dmitrienko Mot. To Dismiss at 7. Other situations, too, demonstrate just how unusual the circumstances must be to warrant dismissal. As the Ninth Circuit summarized one sampling of case law:

> The courts have upheld all of the following: Use of false identities by undercover agents, *Shaw*, 796 F.2d at 1125, and *United States v. Marcello*, 731 F.2d 1354, 1357 (9th Cir. 1984); the supply of contraband at issue in the offense, *Hampton v. United States*, 425 U.S. 484, 489…(1976); the commission of equally serious offenses by an undercover agent as part of the investigation, *United States v. Stenberg*, 803 F.2d 422, 430 (9th Cir. 1986); the introduction of drugs into a prison to identify a distribution network, *United States v. Wiley*, 794 F.2d 514, 515 (9th Cir. 1986); the assistance and encouragement of escape attempts, *United States v. Williams*, 791 F.2d 1383, 1386 (9th Cir. 1986); use of a heroin-using prostitute informant whose own activities were under investigation and who engaged in regular intercourse with the defendant, [ ] *Simpson*, 813 F.2d at 1465-71.

*Smith*, 924 F.2d at 897; *see also, e.g.*, *United States v. Haas*, 141 F.3d 1181, 1998 WL 88530, at *1 (9th Cir. 1998) (unpublished) ("We have characterized outrageous government conduct by various highly restrictive terms, such as 'most narrow,' 'shocking to the universal sense of justice,' 'only the most intolerable government conduct,' and 'slim category.'"). Indeed, the Ninth Circuit has dismissed an indictment based on an outrageous-government-conduct claim just once in a published opinion, where "the government supplied the equipment and raw material for a bootlegging operation and was the defendant's sole customer." *Dominguez-Caicedo*, 40 F.4th at 949 (citing *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), as described in *United States v. Mayer*, 503 F.3d 740, 754 (9th Cir. 2007)). And even that one case, *Greene*, has been abrogated or at least does not reflect applicable law on this issue. *See Haas*, 1998 WL 88530, at *1.

### B. Dmitrienko's Motion Should Be Denied

Dmitrienko's motion fails because he there was no improper, let alone outrageous, government conduct. He also mistakes the facts surrounding this investigation and conflates factual and legal concepts. One key mistake he makes is to conflate the government's involvement in Anom *devices* with the Anom *Enterprise*. This section

explains that more fully and discusses each of the factors to be considered when a defendant alleges outrageous government conduct—and there was none here.

### 1. Criminal Characteristics of the Defendants

This factor weighs strongly against dismissal. As the United States has described, *see* Dkt. 169, at 3-4, the growth of Anom was organic. Without a doubt, the CHS and FBI created the Anom device and its capabilities, and the government had a substantial role in making it available to transnational criminal organizations and their members. Because of that organic growth, driven by the demands of criminals in over 100 countries, the United States had a good idea of the type of individuals who would utilize Anom devices but did not know ahead of time in exactly whose hands the devices be. As a result, the FBI did not have advanced, specific information about the criminal characteristics of the person—Dmitrienko—using the JIDs attributed to him. But agents did know that hardened encrypted devices were in high demand by TCOs because they provided a shield against law enforcement and facilitated criminal activity, including drug trafficking, money laundering, and obstruction of justice, and that Anom devices would be offered to TCOs through the CHS. *See* Cheviron Aff. at 5, ¶ 11; 6-8, ¶¶ 12-13, 15-16. The FBI was also aware that hardened encrypted devices are not known to be used by simply privacy-minded people because of their high cost and limited functionality, as demonstrated by the investigations into predecessor platforms such as Phantom Secure; the demand was "primarily driven by the requirements for organized crime." *Id.* at 5, ¶ 11. As a result, agents certainly were aware of the criminal characteristics of the individuals who would be using Anom—distributors of hardened encrypted devices and members of criminal organizations. Other evidence in the case shows the same and demonstrates the reasonableness of the government's conduct. For instance, in the September 2019 MLAT request from the United States to the third country—before any collection of Anom data there began—the government also described TCOs need for hardened encrypted devices and the use of these devices for illegal activity, including drug trafficking and money

laundering. *See* Gov. Resp. in Opp. to Dmitrienko's Mot. To Compel Discovery (Mar. 6, 2024), Ex. 2 at 2-7.[2]

Accordingly, the government knew that Anom users, like Dmitrienko as it turned out, were predisposed to distributing hardened encrypted devices and committing criminal offenses. *See, e.g.*, *id.* at 5, ¶ 10 (discussing the admitted criminal offenses relating to Phantom Secure and Vincent Ramos). This cuts against dismissal. *See Black*, 733 F.3d at 304-05 (and citing cases). It is also closely related to the next factor, individualized suspicion, and as Dmitrienko suggests but stops short of fully admitting, *see* Dmitrienko Mot. To Dismiss at 9: the government may properly "focus[] on a category of persons it had reason to believe were involved in the type of illegal conduct being investigated." *Black*, 733 F.3d at 304; *see Garza-Juarez*, 992 F.2d at 899-900, 903-04.

### 2.  Individualized Suspicion

This factor weighs strongly against dismissal. As noted, the government can focus on a category of people suspected to be involved in the criminal activity being investigated, even if there isn't suspicion specific to identified, individual people. *Id.* That is what happened here: the FBI initiated the investigation and, through the CHS, made Anom devices available to criminal organizations and distributors of hardened encrypted devices. *See* Cheviron Aff. at 5, ¶¶ 10-11; 6-8, ¶¶ 12-13, 15-16. The government knew that devices would be made available to TCOs and individuals already involved in the distribution of devices made for criminal purposes, and the government was investigating drug trafficking, money laundering, and obstruction of justice offenses—and associated RICO conspiracy conduct. This is proper investigative conduct.

One illustrative case is *United States v. Bagnariol*, 665 F.2d 877 (9th Cir. 1981) (per curiam). There, authorities "set [undercover agent] Heald up as 'bait' by spreading word

---

[2] The government could also provide other examples from discovery, if the Court so wishes in ruling on Dmitrienko's motion. It does not do so here because Dmitrienko points to no specific evidence, and no communications from discovery, in arguing about the outrageousness of the government's conduct. That's because he can't.

generally" that a fictitious California company, "So-Cal[,] was interested in promoting gambling legislation and in meeting politicians who shared that interest." *Id.* at 882. That led the undercover agent to one defendant, Gallagher, "who volunteered the services" of two other defendants. *Id.* Gallagher claimed that the defendants "planned to expand gambling gradually while maintaining control over its operation and were looking for the proper vehicle in which to vest that control"—and the government, "through So-Cal, provided that vehicle." *Id.* Without the government inducing any other action, the defendants joined with the undercover in an equal partnership and "offered as their contribution the passage of necessary legislation in exchange for a portion of the proceeds from expanded gambling." *Id.* This was in the context of a two-year investigation by the FBI into gambling and political corruption. In affirming the denial of the defendants' motion to dismiss for outrageous government conduct, the Ninth Circuit concluded that "[i]t would be extreme to characterize the government's involvement as outrageous or shocking to the sense of justice." *Id.* at 880, 882. Like in that case, here, the FBI made available a product and a service that a group of suspects was interested in. Dmitrienko and other defendants then took the "bait," and there is no ground for dismissing the indictment based on this type of covert investigation. *See id.* at 882; *Black*, 733 F.3d at 304.

### 3. The Government's Role in Creating the Crimes

This factor is where Dmitrienko's contentions really begin to lose traction. He conflates the device with the illegal enterprise, and his argument crumbles as a result. This factor too weighs firmly against dismissal.

Dmitrienko claims the government's role "in creating that enterprise" was "total." Dmitrienko Mot. To Dismiss at 10. He is right—and the government does not deny—that it "created, managed, and controlled the undercover business" of Anom.[3] With the CHS,

---

[3] Dmitrienko references certain public statements by the prosecution team in his motion, as if he is digging up dirt. *See* Dmitrienko Mot. To Dismiss at 1 (regarding 2023 Service to America Medal in Security and International Affairs), 3 (same), 5 (same), 6 (regarding Europol Podcast), 10 (regarding 2023 Service to America Medal). Those are red herrings. As the government explained at the March 20, 2024 hearing in this case after

the government developed the Anom platform and capabilities and developed opportunities to covertly monitor communications on Anom devices. *E.g.*, Cheviron Aff. At 7-10, ¶¶ 12-18. But the *enterprise* is a different factual and legal matter. The government did not create the Anom Enterprise. It did not create the RICO crime or predicate offenses charged in the Indictment. Defendants did.

Aside from the facts already set forth in prior briefing and Special Agent Cheviron's affidavit, Dmitrienko's and other Defendants' own Anom communications only highlight their actions—largely initiated of their own accord and not at the prompting of any government actor—on behalf of the enterprise and in furtherance of the predicate offenses. As one example, in March 2021, Dmitrienko wrote to 31 other Anom users (including other Defendants), about a "smear campaign" against Anom by another encrypted device company. He explained the use and utility of a proxy network, discussed VPNs, and noted the lack of any third-party software, among other things, in defending and further promoting Anom. As another example, on at least two different occasions (in November 2020 and February 2021), Dmitrienko wrote to Hosseini about Dmitrienko's "company in Delaware, United States," offering to register with it to avoid "any VAT problems or whatever questions asked," and promoting it as an avenue for laundering proceeds:

---

Dmitrienko's counsel briefly raised similar points: there is no inconsistency between the government's positions in this case and those statements, and there is no sensitive, protected information disclosed there that entitles the defense to the discovery previously sought. In fact, Dmitrienko is not claiming any inconsistency and does not raise any new information by citing those public statements. And the fact that an investigation like Operation Trojan Shield has received media and other attention, and some public statements have been made by members of the government's team, does not change any factual or legal analysis. Nothing about the statements he cites is outrageous, and none of them warrants dismissal.

For reference, the Samuel J. Heyman Service to America Medals recognize and are awarded to federal employees in multiple fields each year. *See* Samuel J. Heyman Service to America Medals, https://servicetoamericamedals.org/ (last visited July 26, 2024). The organization behind them is the Partnership for Public Service, which describes itself as "a nonprofit, nonpartisan organization that is building a better government and a stronger democracy." Partnership for Public Service, https://ourpublicservice.org/ (last visited July 26, 2024).

"Delaware company 0% tax and no bookleeping" [sic]; "It works good as long as you dont sell anything to us and have to pay tax there // Yes this is pure moneylaundring 😂[sic]." Dmitrienko and other Defendants also had numerous conversations about drug trafficking and obstruction of justice offenses.

In short, the Defendants themselves established the Anom Enterprise and committed the charged illegal conduct. The government's involvement was proper and far from "outrageous." *See Black*, 733 F.3d at 307 (affirming denial of motion to dismiss and explaining that defendants "were eager to commit the fictional stash house robbery, and they joined in the conspiracy without any great inducement or pressure from the government. Indeed, the defendants before us in the appeal were recruited by other defendants, not by Agent Zayas or the CI."); *Bagnariol*, 665 F.2d at 882-83.

### 4. The Government's Encouragement of Defendants

This factor too counsels against dismissal. "[M]ere encouragement" of defendants is "of lesser concern than pressure or coercion." *Black*, 733 F.3d at 308. The government's proposing the offense does not mean there was improper encouragement, let alone pressure or coercion. *Id.* Here, as described above, the government made Anom devices available and covertly managed the platform, while the growth was organic. There is no evidence of pressure. There was no coercion. And Dmitrienko and other Defendants did not require encouragement—they "eagerly jumped at the opportunity" to use and distribute Anom hardened encrypted devices. *See id.*; *see also United States v. So*, 755 F.2d 1350, 1353-54 (9th Cir. 1985) ("the government's conduct in this case, while providing the funds and opportunity to launder money, was clearly not so grossly shocking and so outrageous as to violate the universal sense of justice." (citation omitted)).

Again, Dmitrienko confuses the issue by claiming that the "entire purpose of Operation Trojan Shield was to encourage the users to engage in the charged criminal conduct, i.e., the RICO conspiracy…" Dmitrienko Mot. To Dismiss at 11. Not so. Through investigation, the FBI knew about the market and specialized—criminal—demand for hardened encrypted devices, and the government simply "infiltrate[d]…criminal

organizations" and "provide[d] valuable [or] necessary items to the conspiracy." *So*, 755 F.2d at 1353 (citations omitted). The government did not create the conspiracy or the Anom Enterprise, and it certainly did not apply pressure, coerce, or so encourage any Defendant to engage in the charged offenses.

### 5. Nature of the Government's Participation

Dmitrienko doubles down on his mischaracterizations to claim that this factor favors dismissal. The Ninth Circuit has looked to the duration, nature, and necessity of the government's participation. *See Black*, 733 F.3d at 308-09. None of these criterion helps Dmitrienko.

First, there is no question Operation Trojan Shield and the investigation of the Defendants was of substantial duration. A long-term approach was necessary, both to develop the ability to infiltrate criminal organizations around the world with the Anom platform and to effectively monitor and investigate Anom users' communications—and no non-criminal user has been identified, as the government has previously explained. *E.g.*, Cheviron Aff. at 8, ¶ 15; 10-11, ¶ 20. But any active role by the FBI was much more limited; Anom devices were initially made available by and distributed through the CHS, and the FBI kept the platform and collection of Anom data going, but the Defendants and other Anom users took it from there. Dmitrienko and other Defendants themselves promoted, sold, and profited from the use and distribution of Anom devices, while the government covertly kept reviewing Anom data through the MLAT process with the third country, analyzing the data, and appropriately addressing threats to life. There is nothing about the long-running investigation of the Defendants' conspiracy and criminal organizations around the world that supports dismissal.

Second, to the nature of the government's involvement: U.S. authorities were not a "partner in the criminal activity." *See Black*, 733 F.3d at 308. The FBI was not driving demand or distribution of Anom devices, let alone the extensive drug trafficking, money laundering, or obstruction of justice offenses; the Defendants and other Anom users were. *See United States v. Williams*, 547 F.3d 1187, 1201 n.11 (9th Cir. 2008) (rejecting

outrageous government conduct claim because, among other reasons, the defendant "participated in the planning stages of the stash house robbery…arranged for his crew to help him…sold weapons to raise money to rent the car for the robbery, and he repeatedly indicated his willingness to do the job"). The government "'may have provided valuable and necessary items to the venture,' but that is insufficient to demonstrate that the government directed the enterprise from start to finish." *Id.* (quoting *Gurolla*, 333 F.3d at 950 (cleaned up)); *see United States v. Prudhomme*, 953 F.2d 1389, 1992 WL 9878, at *1-*2 (9th Cir. 1992) (unpublished) (defendant arrested after purchasing items from a government-informant-run chemical supply company (TNS); affirming denial of outrageous-conduct motion because "[d]espite the extensive involvement of the government agents in TNS, and the assistance TNS rendered methamphetamine manufacturers such as Prudhomme, the fact remains that the government did not create the crime for which Prudhomme pled guilty").

Third, the "necessity" aspect of this analysis, on the facts here, shows that Dmitrienko and other Defendants "would have had the technical expertise or resources to commit such a crime without the government's intervention." *Black*, 733 F.3d at 309. The government created and made available the Anom platform because of the criminal demand for hardened encrypted devices, and Defendants had the resources and experience to carry out predicate acts, market such devices, and to create an enterprise around them. *E.g.*, Cheviron Aff. at 4-6, ¶¶9-12; 11, ¶21 (discussing the criminal use of hardened encrypted devices and companies including Phantom Secure, Sky Global, Ciphr, and EncroChat). And even setting aside other Defendants' expertise in this market, Dmitrienko himself shows his know-how, as shown in the above message in response to the "smear campaign.". The duration, nature, and necessity of the government's involvement here was not outrageous or "inherently immoral." *See Smith*, 924 F.2d at 897; Black's Law Dictionary (malum in se) (12th ed. 2024).

Finally, Dmitrienko bootstraps his confusion of the device and enterprise to claim that "because the government created and facilitated the RICO enterprise, it certainly acted

as a partner in the charged offense conduct," Dmtrienko Mot. To Dismiss at 12, and "Anom would not have existed without the government," *id.* at 13. True enough that the Anom device and capabilities would not have existed without the FBI's involvement. But that does not mean the government created the Anom Enterprise or the crimes.

### 6. Nature of the Crime and Necessity of the Actions

This last factor underscores the reasonableness of the government's investigation. At this step, courts account for "the need for the investigative technique that was used in light of the challenges of investigating and prosecuting the type of crime being investigated." *Black*, 733 F.3d at 309. Dmtrienko cites the dangers of drug trafficking to the United States,[4] but there is also more. Hardened encrypted devices are designed as they are to avoid law enforcement surveillance and detection; they are designed to facilitate and conceal criminal activity. *See* Cheviron Aff. at 5, ¶ 11. Investigating organizations that use them and commit crimes with them is not easily done. The government's development of the Anom platform and the means of collecting users' communications was necessary to infiltrating these criminal networks, including the Defendants and others who distributed the devices; and it was very productive, as the government gained evidence that would not have been available without the covert monitoring and analysis of Anom data. *See id.* at 5-23, ¶¶11-35.

The nature of the offenses and complexities in investigating them demonstrates only the propriety, nothing outrageous, about the government's conduct here. *See Black*, 733 F.3d at 309; *United States v. Wiley*, 794 F.2d 514, 515 (9th Cir. 1986) (affirming denial of motion to dismiss; "find[ing] nothing improper in the government's activation of the

---

[4] He proceeds on a narrow and false premise, that there was no harm or alleged harm to this country from drugs. Dmtrienko Mot. to Dismiss at 13. He claims that "the government has not alleged *any* drug trafficking activity in this country." *Id.* False. The indictment itself alleges it. Dkt. 68, ¶¶ 19, 26, 29. And those facts bear out; there were drugs trafficking through the United States and Southern District of California, *e.g.*, Cheviron Aff. at 21-23, ¶¶ 30-35; Dkt. 276 (Kumar Plea Agreement) at 6-7, ¶ 7(e), and there were Anom devices in Mexico, contrary to Dmtrienko's claim, Dmtrienko Mot. To Dismiss at 13.

[prison] smuggling scheme[,] [g]iven the difficulties of penetrating contraband networks in prisons…").[5]

### C. Dmitrienko Cites No Authority Justifying Dismissal

Finally, Dmitrienko claims that three cases "add considerable weight to [his] argument." Dmitrienko Mot. To Dismiss at 17. They don't.

*Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), *see* Dmitrienko Mot. To Dismiss at 15-16, was more of an entrapment than allegedly outrageous government conduct case; and because it predated *United States v. Russell*, 411 U.S. 423 (1973), and *United States v. Hampton*, 425 U.S. 484 (1976), it "does not reflect the current law of the circuit on outrageous government conduct." *Haas*, 1998 WL 88530, at *1. Even so, *Greene* is wholly distinct from the facts here. In that case, an undercover agent held himself out as "a gangster" to try to infiltrate an organization thought to be selling bootleg whiskey. 454 F.2d at 784. After extensive contacts between the agent and defendants, "the defendants sold illicit spirits only to the Government, through its undercover agent…," and the agent's own involvement was substantial because "he offered to provide a still, a still site, still equipment, and an operator[,]" along with 2,000 pounds of sugar at a wholesale price. *Id.* at 786, 787. In other words, the government appeared to provide everything necessary and the only ultimate avenue for the crime. Not so in this case, where Dmitrienko and other Defendants formed their own enterprise, promoted, sold, profited from, and committed numerous other crimes by using Anom devices. *See also Black*, 733 F.3d at 309 (distinguishing *Greene* because, among other reasons, "although the government took the

---

[5] Dmitrienko cites *United States v. Emmert*, Dmitrienko Mot. To Dismiss at 14, but in that case, the Ninth Circuit affirmed the district court's denying the defendant's claim of outrageous conduct. 829 F.2d 805, 812 (9th Cir. 1987) (concluding, among other things, that "the [$200,000] amount of the finder's fee offered Emmert and Powell renders the government's conduct outrageous. Like the intimidation, large sums of money are common to narcotics enterprises and necessary to create a credible cover for undercover agents. Furthermore, [the CI's] offer of the large finder's fee was not intended as bait for college students, but as a method to smoke out a supplier capable of selling large quantities of cocaine").

initiative of approaching the defendants and proposing the fictitious stash house robbery, thereafter it played a minimal role in the crime"); *United States v. Zermeno*, 977 F.2d 594, 1992 WL 281014, at *1-*2 (9th Cir. 1992) (unpublished) (concluding that defendants and co-conspirators "were already experienced in heroin trafficking before their involvement in these transactions," and "[u]nlike the situation in *Greene*, the government did not pressure the defendants to engage in illegal activity" and "was also not the trafficker's sole customer"); *Citro*, 842 F.2d at 1153 ("While it is true that the government supplied the counterfeit credit cards, and initially raised the idea of a counterfeit credit card scheme, unlike *Twigg* [below] and *Greene*, the government did not create the criminal activity.").

*United States v. Archer*, *see* Dmitrienko Mot. To Dismiss at 16, involved the government's "causing the bribery of a state assistant district attorney by a scheme which involved lying to New York police officers and perjury before New York judges and grand jurors[.]" 486 F.2d 670, 672 (2d Cir. 1973). During an investigation into corruption in the New York criminal justice system, law enforcement "manufactured" an interstate call "for the precise purpose of transforming a local bribery offense into a federal crime," "plant[ed]…misinformation which provoked interstate telephone calls that [defendant] would not otherwise have made," and relied on a third interstate call—"a matter of happenstance," as the Second Circuit called it—as three communications underlying the Travel Act and conspiracy charges. *Id.* at 681-83. The Court reversed because the evidence was insufficient to support the defendants' convictions, concluding that federal jurisdiction had been manufactured, but did not rule on whether the government's conduct was "outrageous" to require reversal on that basis. *Id.* at 674-77, 681-83. Dmitrienko acknowledges this. Dmitrienko Mot. To Dismiss at 18 ("in *Archer*, 'the federal officers themselves supplied the interstate…element'" (quoting *Archer*, 486 F.2d at 682)). Here, in contrast, the government did not "manufacture" or "plant" any illegal conduct; the creation of the Anom Enterprise was the Defendants' own, and they used devices and their association-in-fact to commit and further numerous drug trafficking, money laundering, and obstruction of justice predicates. *See also Bagnariol*, 665 F.2d at 883 n.2, 898 n.15

15

(distinguishing *Archer* and explaining that the Second Circuit "reversed Travel Act and conspiracy convictions on narrow federal jurisdiction grounds," and it "has been characterized as a case involving virtual entrapment…and has been severely restricted." (citation omitted)).

*United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), also lends little support to Dmitrienko's argument. *See* Dmitrienko Mot. To Dismiss at 17. There, a former defendant who cooperated with the DEA contacted, at DEA's request, an acquaintance and made arrangements to set up a methamphetamine lab. 588 F.2d at 375. The DEA provided 2.5 gallons of the precursor that was most difficult to obtain, 20 percent of the required glassware, and a rented farmhouse for the lab, and made arrangements with chemical suppliers to facilitate the purchase of remaining materials by the cooperator. *Id.* at 375-76, 380. The lab operated for one week, and the cooperator "was completely in charge of the entire laboratory. Any production assistance by [defendants] was minor and at the specific direction of Kubica." *Id.* at 376. This conduct, the Third Circuit concluded, warranted dismissal of all but one cocaine possession count because, in addition to the support for the charged offenses, "the DEA agents deceptively implanted the criminal design in Neville's mind." *Id.* at 381. Operation Trojan Shield involved nothing like that. Again, the FBI, with the CHS, created the Anom platform and offered it to others, including Defendants here, who already were involved in the distribution of hardened encrypted devices—but the Defendants and other Anom users took it from there and created the enterprise, and committed offenses, on their own accord. *See also Black*, 733 F.3d at 309 (distinguishing *Twigg*); *Shaw*, 796 F.2d at 1126 (reversing grant of *habeas corpus* petition on outrageous conduct grounds; and noting the police activity in the crimes, attempting to receive stolen property and unauthorized possession of food stamps, "was not as long as deep as it was in" *Twigg* or *Greene*, and because, among other reasons, agents "may supply the contraband which is at the heart of the offense" and "may 'coach' their willing suspects." (citations omitted)).

## IV. CONCLUSION

For the foregoing reasons, Dmitrienko's motion to dismiss should be denied.

DATED: August 1, 2024

Respectfully submitted,

TARA K. McGRATH
United States Attorney

*/s/ Peter S. Horn*
JOSHUA C. MELLOR
MIKAELA L. WEBER
PETER S. HORN
Assistant U.S. Attorneys
Attorneys for the United States